David Pivtorak (*Pro Hac Vice* application forthcoming)
**THE PIVTORAK LAW FIRM**
611 Wilshire Boulevard, Suite 911
Los Angeles, CA 90017
Telephone: (213) 291-9130
Facsimile:  (877) 748-4529
Email: david@piv4law.com

Aaron T. Martin (AZ Bar No. 028358)
**MARTIN LAW AND MEDIATION PLLC**
2415 East Camelback, Suite 700
Phoenix, AZ 85016
Telephone: (602) 812-2680
Facsimile:  (602) 508-6099
Email: aaron@martinlawandmediation.com

Attorneys for Plaintiff,
BRIAN NETZEL, individually,
and on behalf of others similarly situated

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| BRIAN NETZEL, individually, and on behalf of others similarly situated; | Case No. |
| Plaintiffs, | **CLASS ACTION** |
| vs. | COMPLAINT FOR INJUNCTIVE/DECLARATORY RELIEF AND DAMAGES: |
| AMERICAN EXPRESS COMPANY; and DOES 1 through 10, inclusive; | **Violations of Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e, *et seq.*) and 42 U.S.C. § 1981** |
| Defendants. | **Jury Trial Demanded** |

Individual and Representative Plaintiff, Brian Netzel, on behalf of himself and all others similarly situated, alleges, upon personal knowledge as to himself and upon information and belief as to other matters, as follows:

## INTRODUCTION

1.      This case is a tragic illustration of the universal truth that "racial engineering does in fact have insidious consequences." *Fisher v. University of Texas at Austin*, 570 U.S. 297, 331 (2013) (Scalia, J., concurring).

2.      Defendant American Express is a global, multi-billion dollar financial services firm with over 60,000 employees. When the company's Board of Directors and its CEO, Stephen Squeri, decided that they wanted the percentage of black employees in the company to match that of the U.S. population, American Express implemented policies to achieve that numerical goal without any regard for employees in unfavored racial categories or existing civil rights laws.

3.      American Express used a carrot-and-stick approach for enforcing its racial quotas. Executives were given financial incentives that accounted for at least 15% of their annual bonus to decrease the percentage of white employees in their departments. Those who were unwilling to make employment decisions based purely on race rather than merit were lambasted, punished, and even terminated.

4.      The tactics became exponentially more aggressive after the death of George Floyd. American Express installed black individuals in executive positions across the country in unprecedented numbers with the intent that they would help to expedite its agenda. In many cases, as further described below, the results exceeded expectations.

5.      Once American Express and Mr. Squeri handed down their racial engineering marching orders, it gave executives *carte blanche* to ruthlessly implement a racial caste and quota system in the company. For instance, upon information and belief, one executive explicitly told the directors working below him in a meeting that "we are only hiring black

people from now on." Afterwards, this same executive harshly and severely reprimanded his underling for hiring someone who was not black.

6.    This situation and many like it played out throughout the company. In recent mass layoffs, the burden was disproportionately felt by white employees where, in some teams, the only individuals who were not let go were black.

7.    American Express also reiterated its policies through constant race trainings and messaging to employees. The company repeatedly instructed its workers that black employees and customers were to be given favorable treatment and there would be "zero tolerance" for racial incidents of any kind. However, enforcement of the rules only flowed one way so that black employees and customers became untouchable.

8.    Like in any society whose authorities enforce rules differently based on identity group membership life at American Express became racially toxic, especially for white employees. The company's policies incentivized coworkers and supervisors to use race as a cudgel through which personal grudges and ambitions could be executed. Upon information and belief, this resulted in hundreds of white employees being terminated or forced to leave the company because they could not tolerate the racially repressive environment.

9.    For those that remained, American Express deducted the difference between the working conditions promised and those received from their hearts and their self-esteem and their mental health.

## **PARTIES**

10.    Plaintiff Brian Netzel ("Plaintiff" or "Netzel"), who is white, was employed at all relevant times herein by Defendant and was an "employee" within the meaning of 42 U.S.C. § 2000e(f).

11.    Upon information and belief, Defendant American Express Company ("AmEx") is a corporation organized under the laws of the State of New York and is

headquartered at 200 Vesey Street, New York City, NY 10285. At all relevant times herein, AmEx employed more than 500 employees and is an "employer" within the meaning of 42 U.S.C § 2000e(b).

12.     Plaintiff is not aware of the true names and capacities of the defendants sued as DOES 1-10, inclusive, and therefore sue these defendants by such fictitious names. Each of these fictitiously named defendants is responsible in some manner for the activities alleged in this complaint. Plaintiff will amend this complaint to add the true names of the fictitiously named defendants once they are discovered.

13.     Plaintiff alleges, on information and belief, that at all times relevant hereto each of the defendants, including each DOE, was the agent, principal, servant, master, employee, employer, joint-venturer, partner, successor-in-interest, and/or coconspirator of each other defendant and was at all said times acting in the full course and scope of said agency, service, employment, joint venture, concert of action, partnership, successorship, or conspiracy, and that each defendant committed the acts, caused or directed others to commit the acts, or permitted others to commit the acts alleged in this complaint and is itself liable for the conduct of the named defendants herein.

## JURISDICTION AND VENUE

14.     This Court has original subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1343 because it arises under the laws of the United States and is brought to recover damages for deprivation of equal rights.

15.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)-(c) and 42 U.S.C. § 2000e-5(f)(3) because Defendant conducts business and can be found in this district and a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this district, and because the alleged unlawful employment practices were committed here, and employment records relevant to that practice are maintained and administered here.

16.     Plaintiff has exhausted his administrative remedies and complied with all statutory prerequisites to his Title VII claims.

## FACTUAL ALLEGATIONS

17.     Over the past several years Defendant has been subject to multiple government and regulatory investigations regarding deceptive and illegal business practices.[1] Aside from paying out over $200 million in fines and penalties, AmEx also faced damage to its brand from the scandals.

18.     Upon information and belief, Defendant sought to launder its reputation by implementing a variety of "social justice" policies that would deflect attention away from the bad publicity. The most prominent policy was aimed at increasing the percentage of black employees in the company, whether through hiring, promotion, or termination.

19.     Upon information and belief, AmEx executed this policy with a callous indifference towards civil rights laws or the welfare of the employees whose lives would be upended by it.

### AmEx's Corporate Structure

20.     Due to its size and variety of services it provides AmEx is divided into approximately 12 "business units" that represent different branches of its operations.

21.     Each business unit is subdivided into "groups" that are led by a president who serves directly under the company's CEO. The groups are further separated, based on operational needs, into departments serving geographic "regions," or national customer bases under a high-ranking Vice President ("VP"). In some groups the departments are also broken down into smaller "teams" of approximately eight people who function under a "director." Under the directors are managers who interact with clients and sometimes supervise a small number of other employees.

---

[1] For example, Defendant was fined $96 million by the U.S. Consumer Financial Protection Bureau over discriminatory terms in its credit card agreements in Puerto Rico and other U.S. territories and $85 million for illegal card practices. Upon information and belief, American Express is also currently being investigated by the IRS for giving illegal and faulty tax advice with multiple other investigations pending.

22.     At AmEx each employee is categorized with a "band" number which signifies their role in the hierarchy. The bands range from "25" for an entry level position all the way to "100" which is the CEO.

23.     Leadership positions start with band 35 which is a client-facing manager or entry-level supervisor. Band 40's are directors with more people reporting to them than band 35's. VP's are staggered in bands 45-60.

24.     The racially discriminatory policies at issue were predominantly focused on increasing the percentage of black employees in bands 35 and higher.

**AmEx Institutes Racially Discriminatory Policies**

25.     Before Mr. Squeri replaced Ken Chenault—one of AmEx's most successful and beloved CEO's—in 2018, the company's hiring and promotion policies were meritocratic and transparent to employees. This contributed to a satisfying working environment where employees felt like compensation and advancement hinged on the quality of their performance rather than the color of their skin.

26.     The policies radically shifted after Mr. Squeri became CEO. The culture and environment at AmEx changed dramatically. Upon information and belief, instead of merit and past performance, race became the dominant factor for individual hiring and promotion decisions.

27.     AmEx's racial engineering policies became exponentially more aggressive and overt after the death of George Floyd in May 2020 with AmEx's "anti-racism initiative."

28.     The company's entire outward focus and agenda became explicitly about catering exclusively to black employees and customers, to the exclusion of every other business objective.

29.     Mr. Squeri began subjecting all AmEx employees to frequent, racially charged "town halls" where he decried America and his own company as "systemically racist."

30.     During the town halls Mr. Squeri also suggested that employees must view each other's race, first and foremost, when interacting with each other—the reason being that white employees all harbor some form of bigotry; and that any dissent from this established narrative would not be tolerated. This was enforced through the announcement of a "zero tolerance" policy for opposition to AmEx's forcibly injecting race into the workplace.

31.     Upon information and belief, Mr. Squeri's "town halls" and the clear policy directives he created gave the green light to other executives to insert racially charged messaging into their own meetings with their subordinates. However, the executives' race-consciousness was reserved only for black employees. Other racial minorities, while not villainized like white employees, were ignored and made to feel insignificant. AmEx's 'diversity and inclusion' push obsessively focused on black employees, making their colleagues feel inadequate and disposable.

32.     Black employees began to be promoted in far higher numbers than before.

33.     Upon information and belief, in many departments directors were not permitted to make hiring decisions unless there were enough black candidates in the pool.

34.     Upon information and belief, in some instances, hiring managers were told to comb through resumes to specifically find black-sounding names so they could single them out for interviews, regardless of qualifications for the position.

35.     AmEx's racial obsession also made its way into employee trainings. Notably, AmEx's employee training sessions—which include the usual compliance, human resources, and similar modules—are always conducted at the beginning of the calendar

year. After George Floyd's death, the company held race-based indoctrination trainings in August and September.

36.     The trainings focused on topics like "microaggressions" and "unconscious bias" and were almost exclusively framed as lessons to white employees about how to conduct themselves around their black coworkers.

37.     For instance, white employees were instructed to take a back seat in relation to their black coworkers, like always letting them speak first in meetings and endorse whatever they say. White workers were also told "don't touch black people's hair." No admonishments were given to black employees nor did the trainings direct black employees on how they should conduct themselves around other races.

38.     AmEx's "anti-racism initiative" engaged in other harmful stereotypes against white employees and deliberately maximized their psychological distress. The explicit promise of many of the policies associated with the initiative was to create discomfort in white employees because of their race.

39.     Indeed, it became rare for several days to go by without seeing the term "uncomfortable conversations" in company-wide communications. However, it was only white employees who they meant to make "uncomfortable" because of their race. AmEx made it clear that it would strictly apply its "zero tolerance" policy to any conversations that created discomfort in any other racial group.[2]

40.     This was enforced through a Stasi-like "see something, say something" policy regarding racial issues that encouraged employees to anonymously report white coworkers for violations. Because the policies were explicitly advertised as being necessary for the "safety" of black colleagues, they created a tense, racially charged atmosphere that left white employees walking on eggshells, terrified of doing or saying anything that would prompt an allegation of racism, no matter how spurious.

---

[2] AmEx's uneven, race-based enforcement of its "zero tolerance" policy is discussed in more detail, *infra*.

41.     Conversely, black employees were able to bully and abuse white coworkers so long as it was couched in the language of "anti-racism."

42.     Simultaneously, AmEx recreated all of its marketing and promotion materials from scratch so they were mostly black.

43.     AmEx also spent tens of thousands of dollars to create Black Lives Matters ("BLM") stickers to give to merchants, some of whose stores were burned down during the BLM riots.

44.     AmEx's policies extended to its customers and cardholders as well. Upon information and belief, the company modified its financial qualifications specifically to expand the net of black cardholders.

45.     Additionally, AmEx announced new policies that would terminate the accounts of members it felt mistreated black employees and fire employees who were accused of mistreating black customers. AmEx did not extend these same protections to white cardholders or employees who faced similar mistreatment from black individuals.

46.     In one case, upon information and belief, a white employee was working with a black merchant who was applying for a business account. When the merchant was told she could not open a card without documentation required by AmEx's guidelines the merchant became extremely hostile and abusive. The white employee told her that she was cut off from services because of her conduct. Shortly thereafter, the white employee was terminated by AmEx.

47.     Upon information and belief, the employee was terminated because of his race and AmEx's race-based policies.

///

///

///

///

**AmEx Executives Put Its Racial Engineering Policies into Practice**

48.     During a company-wide town hall, in or about July 2020, Mr. Squeri gave a presentation with slides that showed the percentage of black employees in every single band within the company. Mr. Squeri stated that in every band the percentage of black employees must be increased to match that of the U.S. population by 2023. Mr. Squeri also stated that if employees were not happy with the quota system being implemented that they should find another place to work.

49.     At no point did Mr. Squeri bring up Equal Employment Opportunity guidelines or a commitment to uphold non-discrimination legal requirements when discussing his race-conscious policies.

50.     Mr. Squeri also announced that employees would be allowed to go back and change their racial identity in the company's files.

51.     Additionally, Mr. Squeri stated that AmEx had recently done a "pay equity" audit which found any disparity in pay between races to be "statistically insignificant." Despite this Mr. Squeri said he would again review the pay of all "people of color" (read "black") in the company to assure parity. This review ended with pay raises for many black employees but not white employees.

52.     The policies instituted by AmEx gave preferential treatment to individuals for being black and unambiguously signaled to white employees that their race was an impediment to getting ahead in the company.

53.     Upon information and belief, executives were given the go-ahead to increase the number of black employees in the desired bands and reduce the percentage of white employees without any regard for anti-discrimination laws.

54.     In or about October 2020 AmEx promoted a black director to an executive leadership position in one of its largest groups, Global Commercial Services ("GCS"). Almost immediately after obtaining this role the executive promoted three individuals to

serve as his direct reports. Upon information and belief, all three individuals who received promotions were black even though were a disproportionate number of people of other races who were better qualified.

55.     Upon information and belief, this is the same executive who told his directors in a meeting that "we are only hiring black people from now on." Additionally, when one of his subordinates hired a minority who was not black the executive chastised him saying, "you hired the wrong minority."

56.     In another instance, upon information and belief, in or about September 2020 a Group President of another of AmEx's largest groups hired someone from an outside company to report directly to him. This took place during an explicit outside hiring freeze decree at AmEx, meaning that no executives from outside the company could be hired. Additionally, the Group President had preached for years about not hiring "job jumpers" (individuals who've worked at several companies in a short period of time). However, the hire had worked for three companies in the preceding four years but was still hired, in direct violation of the Group President's own policy. Both the Group President and his hire are black.

57.     Additionally, upon information and belief, the Group President had to create an entirely new position, Executive VP, to bring his hire into AmEx. This put the Executive VP directly above a white VP who was the Group President's previous direct report. The white VP had a meteoric rise in the company due to several successful projects.

58.     Upon information and belief, shortly after entering the position created just for her, the black Executive VP terminated the white VP and replaced him with a person of color.

59.     Upon information and belief, during a presentation the Executive VP bragged that her success at AmEx was due to her being a "triple-threat"—black, female, and lesbian.

60.     This was a common theme at AmEx once Mr. Squeri's policies started to permeate the company. Upon information and belief, in the aforementioned groups—which generate the majority of AmEx's revenue and have the largest number of employees—nine or more people of color were promoted in 2019/2020 to executive roles compared to only two or three whites. Upon information and belief, many highly qualified white applicants were overlooked for these promotions due to their race.

61.     Upon information and belief, AmEx's race-based policies caused a disproportionate decrease in the number of white employees hired or promoted into leadership roles.

62.     For white employees in the targeted bands the prospect of a promotion became grim no matter how qualified they were, especially if they were competing against black coworkers.

63.     Upon information and belief, when AmEx conducted rounds of mass layoffs in or about the third quarters of 2021 and 2022, respectively, white employees were let go in wildly disproportionate numbers. Conversely, black employees were retained at rates that far exceeded their representation within the affected bands. Indeed, upon information and belief, in some teams the only individuals who were not laid off were black.

64.     In another instance of AmEx's discriminatory policies, upon information and belief, a Senior VP brought in a woman from a different company with whom he had previously worked. Both are black. The Senior VP promoted the woman to a Director leadership position, with many employees working under her, even though, upon information and belief, she was completely unqualified for the position and there were many superior non-black candidates for the role.

65.     Upon information and belief, while in her new role the Director pushed to have a white subordinate hire the Director's chosen candidate for an open position. The candidate, who was black, was not qualified and a person of a different race was hired for

the position. Upon information and belief, the Director created a new position with a six-figure salary just to bring in the candidate because she was black. All of this was approved by the Senior VP.

66.     Upon information and belief, soon after AmEx's "zero tolerance" policies were implemented a white senior VP and General Manager ("GM") was fired by AmEx because her young daughter made an innocuous comment about a black doll in her doll collection which she was showing during a Zoom meeting.

67.     Upon information and belief, the GM attempted to have an endearing moment on a Zoom with her employees, as many managers did during the pandemic, to alleviate the stress and anxiety of social isolation. The GM had her young daughter with her and had her talk about the dolls she had in her collection. While discussing the various make-believe roles the dolls played she mentioned the black doll was the dishwasher, or a comment to that effect.

68.     Days later the GM was terminated by AmEx with a company-wide email announcing that the company would not tolerate "racially insensitive" statements. The individual who replaced the GM was black.

## CLASS ACTION ALLEGATIONS

69.     Plaintiff brings this action on behalf of himself and as a class action, pursuant to the provisions of Rules 23(a), (b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure on behalf of the following class (collectively, the "Class"):

> All past, present, or potential white employees of American Express in bands 35 and higher who, as a result of the operation of past, current, or planned policies and practices, have been, are being, or will be discriminated against in the terms and conditions of employment, including but not limited to recruitment, hiring, promotions, training, and discharge because of their race.

70.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

71.     This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

72.     <u>Numerosity</u>. Federal Rule of Civil Procedure 23(a)(1): The members of the Class are so numerous and geographically dispersed that individual joinder of all Class members is impracticable. While Plaintiff is informed and believes that there are not less than thousands of members of the Class, the precise number of Class members is unknown to Plaintiff, but may be ascertained from AmEx's books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

73.     <u>Commonality and Predominance</u>: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, without limitation:

a.     whether Defendant engaged in the conduct alleged herein;

b.     whether Defendant's policies and practices amount to discrimination or preferential treatment on the basis of race;

c.     whether Defendant instituted policies and customs that created a racially intimidating work environment;

d.     whether Defendant created racial quotas for leadership positions;

e.     whether plaintiffs are entitled to declaratory relief that Defendant has violated 42 U.S.C. §§ 1981, and 2000e, *et seq.;*

f.    whether equitable remedies, injunctive relief, compensatory damages, and punitive damages for the Class are warranted, and;

g.    whether Defendant has failed to implement policies and procedures to prevent retaliation against employees who challenge discrimination in the workplace and failed to address complaints and conduct proper investigations.

74.    <u>Typicality</u>: Federal Rule of Civil Procedure 23(a)(3): Plaintiff's claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through AmEx's wrongful conduct as described above.

75.    <u>Adequacy</u>: Federal Rule of Civil Procedure 23(a)(4): Plaintiff is an adequate Class representative because his interests do not conflict with the interests of the other members of the Class he seeks to represent; Plaintiff has retained counsel competent and experienced in class action litigation; and Plaintiff intends to prosecute this action vigorously. The Class's interests will be fairly and adequately protected by Plaintiff and his counsel.

76.    <u>Declaratory and Injunctive Relief</u>: Federal Rule of Civil Procedure 23(b)(2): AmEx has acted or refused to act on grounds generally applicable to Plaintiff and the other members of the Class, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class as a whole.

77.    <u>Superiority</u>: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The Class members have been damaged and are entitled to recovery as a result of Defendant's common, uniform, unfair, and discriminatory policies and practices. Further, individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides

the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

78.     Alternatively, class certification with respect to particular issues is appropriate pursuant to Federal Rule of Civil Procedure 23(c)(4).

## CLAIMS OF REPRESENTATIVE PLAINTIFF

79.     Individual and Representative Plaintiff Brian Netzel started working for AmEx in or about 2010. He was soon promoted from a salesperson to a specialist for corporate card sales. After a few years Mr. Netzel was again promoted to a client manager in the Global Merchant Network Services ("GMNS") group in AmEx's Phoenix office.

80.     During his employment at AmEx Mr. Netzel consistently received positive reviews and won many awards, including for leadership.

81.     As a band 35 client manager Mr. Netzel occupied one of the positions specifically targeted by Mr. Squeri and AmEx with their racially discriminatory policies.

82.     In or about 2019 a new VP/GM was transferred to Mr. Netzel's group from the New York office. Upon information and belief, this executive, Therese Banks, had a bad reputation among her colleagues for her management style and was promoted at the insistence of the Group President, discussed above, rather than the executive directly above her (who was white and would normally be responsible for the promotion).

83.     Upon information and belief, Ms. Banks was promoted solely due to her race.

84.     In her new role Ms. Banks, who is black, preferentially treated and promoted black employees while creating a racially hostile work environment for white employees.

85.     Upon information and belief, Ms. Banks explicitly stated on several occasions that the race of black candidates must be considered when making employment decisions. For instance, during one executive meeting Ms. Banks harshly criticized a white underling for a purely merit-based decision to not promote a black subordinate.

86.    Upon information and belief, at the time Ms. Banks was transferred to Mr. Netzel's office one out of the six directors under her were black.

87.    Upon information and belief, soon after Ms. Banks obtained her new role she harassed and bullied two white male directors out of their positions and replaced them by promoting two black managers. At the time, blacks represented less than 10% of the candidate pool.

88.    Upon information and belief, of the four director positions that opened up while Ms. Banks was VP/GM, three went to blacks. One position was kept open by Ms. Banks for approximately six months and eventually filled by a white candidate because no black candidate could be found during that time.

89.    Upon information and belief, Ms. Banks promoted several blacks to leadership positions even though they did not have a college degree. This is significant because Ms. Banks consistently told her team that she would not promote people to those roles without a degree.

90.    Upon information and belief, Ms. Banks denied promotions to multiple white candidates because they did not have a college degree.

91.    Upon information and belief, on at least one occasion, Ms. Banks forced a white subordinate to hire a black candidate over a white candidate even though the black candidate did not have a college degree and was less qualified.

92.    Additionally, Ms. Banks created an uncomfortable and racially hostile environment for her white employees. Ms. Banks' actions became worse after George Floyd's death and in the context of Mr. Squeri's racialized messaging and AmEx's mandated racial indoctrination trainings.

93.    After one of these trainings Mr. Netzel notified AmEx of his opposition to what he believed was the racially discriminatory nature of AmEx's recent actions and messaging.

94.     Upon information and belief, Ms. Banks' leadership style was to aggressively berate and harass white employees; many times during meetings in front of other workers. However, black employees were never subjected to the same treatment.

95.     Upon information and belief, Ms. Banks would also assign too many tasks to white employees and retaliate against them if they complained by chastising them and giving them poor performance reviews.

96.     Upon information and belief, Ms. Banks also held regular, racially segregated work meetings whose members referred to themselves as the "black girls magic" club and included several executives previously described in this complaint.

97.     On or about October 30, 2020, Mr. Netzel's employment was terminated by Ms. Banks. Mr. Netzel was terminated because of his race and because he spoke out against AmEx's racially discriminatory policies.

98.     Upon information and belief, Ms. Banks was one of the executives who received financial incentives from AmEx to reduce the percentage of whites in her department.

99.     All of Ms. Banks' actions as an executive were consistent with the expectations and policies promulgated by AmEx and encouraged by the company and Mr. Squeri.

100.    AmEx was aware of Ms. Banks' racially discriminatory conduct. AmEx was also aware that Ms. Banks—while in her executive role—engaged in continuous unlawful activity that violated various employment statutes and company policies. However, unlike Mr. Netzel and countless other white employees, AmEx did not take any disciplinary action against Ms. Banks, much less terminate her employment. This was solely due to Ms. Banks' race and AmEx's racist policies.

101.    On or about August 12, 2021 Mr. Netzel filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). On or about August 25, 2021

Mr. Netzel filed a supplemental charge of retaliation. On or about June 2, 2022 Mr. Netzel received a Notice of Right to Sue from the EEOC.

## CAUSES OF ACTION

### COUNT 1 – VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 (42 U.S.C. 2000e, *et seq.*) AND 42 U.S.C. § 1981 (Unlawful Race Discrimination)

102. Plaintiff repeats and realleges each of the foregoing allegations in this Complaint as if fully set forth herein.

103. This claim is brought by Individual and Representative Plaintiff on behalf of himself and the Class he represents. Plaintiff has filed a timely charge with the EEOC and has exhausted his administrative remedies.

104. Defendant has engaged in an intentional, company-wide, and systematic pattern and/or practice of discrimination against non-black—and specifically white—employees in bands 35 and higher.

105. Defendant has engaged in an intentional, company-wide, and systematic pattern or practice of discrimination against its employees by, among other things:

    a. Creating racial quotas for leadership positions at AmEx;

    b. Giving executives financial incentives for reducing the number of whites in their departments;

    c. Giving preferential treatment to black employees in hiring and promotion decisions;

    d. Requiring employees to make hiring and promotion decisions based on race and disciplining or chastising employees who refused to comply;

    e. Targeting white employees for harassment during AmEx's "diversity" trainings, executive "town halls," and through its "see something, say something" policies;

  f.  Engaging in disparate treatment of white employees for termination and discipline.

106. Defendant's invidious race discrimination adversely affected the terms, conditions, and privileges of Plaintiff's and the Class's employment.

107. Defendant's discriminatory conduct created an intolerable working environment for Plaintiff and the Class.

108. As a further direct and proximate result of said unlawful employment practices Plaintiff and the Class suffered the indignity of discrimination and invasion of their right to be free from discrimination.

109. As a further direct and proximate result of said unlawful employment practices, Plaintiff suffered extreme emotional distress, shame, intimidation, humiliation, indignation, embarrassment, and fear.

110. Defendant's discriminatory and unlawful employment practices identified in this complaint have been intentional, deliberate, willful, systematic, and conducted in callous disregard of the federally protected rights of Plaintiff and the Class. As a result, Plaintiff and the Class are entitled to compensatory and punitive damages.

**COUNT 2 – VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**
**(42 U.S.C. 2000e, *et seq.*) AND 42 U.S.C. § 1981**
**(Unlawful Racial Harassment/Hostile Environment)**

111. Plaintiff repeats and realleges each of the foregoing allegations in this Complaint as if fully set forth herein.

112. Defendant's policies and practices created a working environment heavily charged with racial discrimination and intimidation. These policies and practices subjected Plaintiff and the Class to a racially hostile work environment.

113. As a further direct and proximate result of said unlawful employment practices Plaintiff and the Class suffered the indignity of discrimination and invasion of their right to be free from discrimination.

114.   As a further direct and proximate result of said unlawful employment practices, Plaintiff suffered extreme emotional distress, shame, intimidation, humiliation, indignation, embarrassment, and fear.

115.   Defendant's discriminatory and unlawful employment practices identified in this complaint have been intentional, deliberate, willful, systematic, and conducted in callous disregard of the federally protected rights of Plaintiff and the Class. As a result, Plaintiff and the Class are entitled to compensatory and punitive damages.

**COUNT 3 – VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**
**(42 U.S.C. 2000e, *et seq.*) AND 42 U.S.C. § 1981**
**(Retaliation)**

116.   Plaintiff repeats and realleges each of the foregoing allegations in this Complaint as if fully set forth herein.

117.   When Plaintiff complained about AmEx's racially discriminatory policies, practices, and hostile environment Defendant retaliated against him for his protected civil rights activity.

118.   Defendant took adverse action against Plaintiff with the purpose of retaliating against him because of his participation in protected activity, and Plaintiff suffered damages as a result of the that conduct.

119.   As a further direct and proximate result of said unlawful employment practices, Plaintiff suffered extreme emotional distress, shame, intimidation, humiliation, indignation, embarrassment, and fear.

120.   Defendant's discriminatory and unlawful employment practices identified in this complaint have been intentional, deliberate, willful, systematic, and conducted in callous disregard of the federally protected rights of Plaintiff. As a result, Plaintiff is entitled to compensatory and punitive damages.

///

///

1

**DEMAND FOR JURY TRIAL**

2

Plaintiff hereby demands a trial by jury on all claims so triable.

3

**PRAYER FOR RELIEF**

4

WHEREFORE, Plaintiff on behalf of himself and all members of the Class prays for

5

relief and judgment as follows:

6

    A.    An order certifying the proposed Class, appointing the named Plaintiff as the

7

        representative of the Class, and appointing the law firms representing the

        named Plaintiff as counsel for the Class.

8

    B.    General and compensatory damages for Plaintiff and the Class for the

9

        violations of their federal statutory rights, and pain and suffering, all

10

        according to proof.

11

    C.    Punitive damages, according to proof.

12

    D.    A declaration that Defendants, through the actions, omissions, policies,

13

        practices, and/or procedures complained of, violate 42 U.S.C. §§ 1981 and

14

        2000e, *et seq.*

15

    E.    Preliminary and permanent injunctive relief for the Class:

16

        1.  Preliminary and permanent injunctive relief requiring Defendant, its

17

            successors in office, agents, employees, and assigns, and all persons

18

            acting in concert with them, to eliminate policies, customs, and/or

19

            practices that discriminate or give preferential treatment to individuals

20

            based on race in recruiting, hiring, promotion, and other terms and

21

            conditions of employment.

22

    F.    Attorneys' fees, costs, interest, and expenses pursuant to 42 U.S.C. §1988 and

23

other relevant statutes.

24

    G.    And such other and further relief as the Court may deem proper.

25

26

27

28

1

DATE:  August 23, 2022                              THE PIVTORAK LAW FIRM

2

3

4

5                                     By:

6                                          _____
                                           DAVID PIVTORAK
7                                          Attorney for Plaintiff,
                                           BRIAN NETZEL, individually,
8                                          and on behalf of others similarly situated

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28