David Pivtorak (*pro hac vice*)
**THE PIVTORAK LAW FIRM**
611 Wilshire Boulevard, Suite 911
Los Angeles, CA 90017
Telephone: (213) 291-9130
Facsimile:  (877) 748-4529
Email: david@piv4law.com

Aaron T. Martin (AZ Bar No. 028358)
**MARTIN LAW AND MEDIATION PLLC**
2415 East Camelback, Suite 700
Phoenix, AZ 85016
Telephone: (602) 812-2680
Facsimile:  (602) 508-6099
Email: aaron@martinlawandmediation.com

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Brian Netzel; Travis Smith; Eric Langkamp; and Nancy Larson, individually, and on behalf of others similarly situated; <br><br> Plaintiffs, <br><br> vs. <br><br> American Express Company; and DOES 1 through 10, inclusive; <br><br> Defendants. | Case No. CV-22-01423-PHX-SMB <br><br> **CLASS ACTION** <br><br> SECOND AMENDED COMPLAINT FOR INJUNCTIVE/DECLARATORY RELIEF AND DAMAGES: <br><br> **Violations of Title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e, *et seq.*), 42 U.S.C. § 1981, California's Fair Employment and Housing Act (Government Code § 12900, *et seq.*), and California's Unlawful and/or Unfair Business Practices Law (Business & Professions Code § 17200, *et seq.*)** <br><br> **Jury Trial Demanded** |

Individual and Representative Plaintiffs, Brian Netzel, Travis Smith, Eric Langkamp, and Nancy Larson, on behalf of themselves and all others similarly situated, allege, upon personal knowledge as to themselves and upon information and belief as to other matters, as follows:

**INTRODUCTION**

1. This case is a tragic illustration of the universal truth that "racial engineering does in fact have insidious consequences." *Fisher v. University of Texas at Austin*, 570 U.S. 297, 331 (2013) (Scalia, J., concurring).

2. Defendant American Express is a global, multi-billion dollar financial services firm with over 60,000 employees. When the company's Board of Directors and its CEO, Stephen Squeri, decided that they wanted the percentage of black employees in the company to match that of the U.S. population, American Express implemented policies to achieve that numerical goal without any regard for employees in unfavored racial categories or existing civil rights laws.

3. American Express used a carrot-and-stick approach for enforcing its racial quotas. Executives were given financial incentives that accounted for at least 15% of their annual bonus to decrease the percentage of white employees in their departments. Those who were unwilling to make employment decisions based purely on race rather than merit were lambasted, punished, and even terminated.

4. The tactics became exponentially more aggressive after the death of George Floyd. American Express installed black individuals in executive positions across the country in unprecedented numbers with the intent that they would help to expedite its agenda. In many cases, as further described below, the results exceeded expectations.

5. Once American Express and Mr. Squeri handed down their racial engineering marching orders, it gave executives *carte blanche* to ruthlessly implement a racial caste and quota system in the company. For instance, upon information and belief, one executive

explicitly told the directors working below him in a meeting that "we are only hiring black people from now on." Afterwards, this same executive harshly and severely reprimanded his underling for hiring someone who was not black.

6.      This situation and many like it played out throughout the company. In recent mass layoffs, the burden was disproportionately felt by white employees where, in some teams, the only individuals who were not let go were black.

7.      American Express also reiterated its policies through constant race trainings and messaging to employees. The company repeatedly instructed its workers that black employees and customers were to be given favorable treatment and there would be "zero tolerance" for racial incidents of any kind. However, enforcement of the rules only flowed one way so that black employees and customers became untouchable.

8.      Like in any society whose authorities enforce rules differently based on identity group membership, life at American Express became racially toxic—especially for white employees. The company's policies incentivized coworkers and supervisors to use race as a cudgel through which personal grudges and ambitions could be executed. Upon information and belief, this resulted in hundreds of white employees being terminated or forced to leave the company because they could not tolerate the racially repressive environment.

9.      For those that remained, American Express deducted the difference between the working conditions promised and those received from their hearts and their self-esteem and their mental health.

## **PARTIES**

10.     Plaintiff Brian Netzel ("Netzel"), who is white, was employed at all relevant times herein by Defendant and was an "employee" within the meaning of 42 U.S.C. § 2000e(f).

11.     Plaintiff Travis Smith ("Smith"), who is white, was employed at all relevant times herein by Defendant and was an "employee" within the meaning of 42 U.S.C. § 2000e(f).

12.     Plaintiff Eric Langkamp ("Langkamp"), who is white, was employed at all relevant times herein by Defendant and was an "employee" within the meaning of 42 U.S.C. § 2000e(f).

13.     Plaintiff Nancy Larson ("Larson"), who is white, was employed at all relevant times herein by Defendant and was an "employee" within the meaning of 42 U.S.C. § 2000e(f).

14.     Upon information and belief, Defendant American Express Company ("AmEx") is a corporation organized under the laws of the State of New York and is headquartered at 200 Vesey Street, New York City, NY 10285. At all relevant times herein, AmEx employed more than 500 employees and is an "employer" within the meaning of 42 U.S.C § 2000e(b) and California Government Code § 12926(d).

15.     Plaintiff is not aware of the true names and capacities of the defendants sued as DOES 1-10, inclusive, and therefore sue these defendants by such fictitious names. Each of these fictitiously named defendants is responsible in some manner for the activities alleged in this complaint. Plaintiff will amend this complaint to add the true names of the fictitiously named defendants once they are discovered.

16.     Plaintiff alleges, on information and belief, that at all times relevant hereto each of the defendants, including each DOE, was the agent, principal, servant, master, employee, employer, joint-venturer, partner, successor-in-interest, and/or coconspirator of each other defendant and was at all said times acting in the full course and scope of said agency, service, employment, joint venture, concert of action, partnership, successorship, or conspiracy, and that each defendant committed the acts, caused or directed others to

commit the acts, or permitted others to commit the acts alleged in this complaint and is itself liable for the conduct of the named defendants herein.

## JURISDICTION AND VENUE

17.     This Court has original subject matter jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1343 because it arises under the laws of the United States and is brought to recover damages for deprivation of equal rights.

18.     In addition, this Court has supplemental jurisdiction over the California state law claims under 28 U.S.C § 1367 because they arise from a common nucleus of operative facts with the federal claims and are so related to the federal claims as to form part of the same case or controversy under Article III of the United State Constitution.

19.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)-(c) and 42 U.S.C. § 2000e-5(f)(3) because Defendant conducts business and can be found in this district and a substantial part of the events and omissions giving rise to the claims alleged herein occurred in this district, and because the alleged unlawful employment practices were committed here, and employment records relevant to that practice are maintained and administered here.

20.     Plaintiff, Brian Netzel, has exhausted administrative remedies and complied with all statutory prerequisites to Plaintiffs' Title VII claims, which satisfies the exhaustion requirement for the other named plaintiffs and the proposed Class.

21.     Plaintiff, Nancy Larson, has exhausted administrative remedies and complied with all statutory prerequisites to Plaintiffs' claims under California's Fair Employment and Housing Act ("FEHA"), which satisfies the exhaustion requirement for the proposed California Subclass.

## FACTUAL ALLEGATIONS

22.     Over the past several years Defendant has been subject to multiple government and regulatory investigations regarding deceptive and illegal business

practices.[1] Aside from paying out over $200 million in fines and penalties, AmEx also faced damage to its brand from the scandals.

23.     Upon information and belief, Defendant sought to launder its reputation by implementing a variety of "social justice" policies that would deflect attention away from the bad publicity. The most prominent policy was aimed at increasing the percentage of black employees in the company, whether through hiring, promotion, or termination.

24.     Upon information and belief, AmEx executed this policy with a callous indifference towards civil rights laws or the welfare of the employees whose lives would be upended by it.

**AmEx's Corporate Structure**

25.     Due to its size and variety of services it provides AmEx is divided into approximately 12 "business units" that represent different branches of its operations.

26.     Each business unit is subdivided into "groups" that are led by a president who serves directly under the company's CEO. The groups are further separated, based on operational needs, into departments serving geographic "regions," or national customer bases under a high-ranking Vice President ("VP"). In some groups the departments are also broken down into smaller "teams" of approximately eight people who function under a "director." Under the directors are managers who interact with clients and sometimes supervise a small number of other employees.

27.     At AmEx each employee is categorized with a "band" number which signifies their role in the hierarchy. The bands range from "25" for an entry level position all the way to "100" which is the CEO.

---

[1] For example, Defendant was fined $96 million by the U.S. Consumer Financial Protection Bureau over discriminatory terms in its credit card agreements in Puerto Rico and other U.S. territories and $85 million for illegal card practices. Upon information and belief, American Express is also currently being investigated by the IRS for giving illegal and faulty tax advice with multiple other investigations pending.

28. Leadership positions start with band 35 which is a client-facing manager or entry-level supervisor. Band 40's are directors with more people reporting to them than band 35's. VP's are staggered in bands 45-60.

29. The racially discriminatory policies at issue were predominantly focused on increasing the percentage of black employees in bands 35 and higher.

## AmEx Institutes Racially Discriminatory Policies

30. Before Mr. Squeri replaced Ken Chenault—one of AmEx's most successful and beloved CEO's—in 2018, the company's hiring and promotion policies were meritocratic and transparent to employees. This contributed to a satisfying working environment where employees felt like compensation and advancement hinged on the quality of their performance rather than the color of their skin.

31. The policies radically shifted after Mr. Squeri became CEO. The culture and environment at AmEx changed dramatically. Upon information and belief, instead of merit and past performance, race became the dominant factor for individual hiring and promotion decisions.

32. AmEx's racial engineering policies became exponentially more aggressive and overt after the death of George Floyd in May 2020 with AmEx's "anti-racism initiative."

33. The company's entire outward focus and agenda became explicitly about catering exclusively to black employees and customers, to the exclusion of every other business objective.

34. Mr. Squeri began subjecting all AmEx employees to frequent, racially charged "town halls" where he decried America and his own company as "systemically racist."

35. During the town halls Mr. Squeri also suggested that employees must view each other's race, first and foremost, when interacting with each other—the reason being

that white employees all harbor some form of bigotry; and that any dissent from this established narrative would not be tolerated. This was enforced through the announcement of a "zero tolerance" policy for opposition to AmEx's forcibly injecting race into the workplace.

36.     Upon information and belief, Mr. Squeri's "town halls" and the clear policy directives he created gave the green light to other executives to insert racially charged messaging into their own meetings with their subordinates. However, the executives' race-consciousness was reserved only for black employees. Other racial minorities, while not villainized like white employees, were ignored and made to feel insignificant. AmEx's 'diversity and inclusion' push obsessively focused on black employees, making their colleagues feel inadequate and disposable.

37.     Black employees began to be promoted in far higher numbers than before.

38.     Upon information and belief, in many departments directors were not permitted to make hiring decisions unless there were enough black candidates in the pool.

39.     Upon information and belief, in some instances, hiring managers were told to comb through resumes to specifically find black-sounding names so they could single them out for interviews, regardless of qualifications for the position.

40.     AmEx's racial obsession also made its way into employee trainings. Notably, AmEx's employee training sessions—which include the usual compliance, human resources, and similar modules—are always conducted at the beginning of the calendar year. After George Floyd's death, the company held race-based indoctrination trainings in August and September.

41.     The trainings focused on topics like "microaggressions" and "unconscious bias" and were almost exclusively framed as lessons to white employees about how to conduct themselves around their black coworkers.

42.     For instance, white employees were instructed to take a back seat in relation to their black coworkers, like always letting them speak first in meetings and endorse whatever they say. White workers were also told "don't touch black people's hair." No admonishments were given to black employees nor did the trainings direct black employees on how they should conduct themselves around other races.

43.     AmEx's "anti-racism initiative" engaged in other harmful stereotypes against white employees and deliberately maximized their psychological distress. The explicit promise of many of the policies associated with the initiative was to create discomfort in white employees because of their race.

44.     Indeed, it became rare for several days to go by without seeing the term "uncomfortable conversations" in company-wide communications. However, it was only white employees who they meant to make "uncomfortable" because of their race. AmEx made it clear that it would strictly apply its "zero tolerance" policy to any conversations that created discomfort in any other racial group.[2]

45.     This was enforced through a Stasi-like "see something, say something" policy regarding racial issues that encouraged employees to anonymously report white coworkers for violations. Because the policies were explicitly advertised as being necessary for the "safety" of black colleagues, they created a tense, racially charged atmosphere that left white employees walking on eggshells, terrified of doing or saying anything that would prompt an allegation of racism, no matter how spurious.

46.     Conversely, black employees were able to bully and abuse white coworkers so long as it was couched in the language of "anti-racism."

47.     Simultaneously, AmEx recreated all of its marketing and promotion materials from scratch so they were mostly black.

---

[2] AmEx's uneven, race-based enforcement of its "zero tolerance" policy is discussed in more detail, *infra*.

48.     AmEx also spent tens of thousands of dollars to create Black Lives Matters ("BLM") stickers to give to merchants, some of whose stores were burned down during the BLM riots.

49.     AmEx's policies extended to its customers and cardholders as well. Upon information and belief, the company modified its financial qualifications specifically to expand the net of black cardholders.

50.     Additionally, AmEx announced new policies that would terminate the accounts of members it felt mistreated black employees and fire employees who were accused of mistreating black customers. AmEx did not extend these same protections to white cardholders or employees who faced similar mistreatment from black individuals.

51.     In one case, upon information and belief, a white employee was working with a black merchant who was applying for a business account. When the merchant was told she could not open a card without documentation required by AmEx's guidelines the merchant became extremely hostile and abusive. The white employee told her that she was cut off from services because of her conduct. Shortly thereafter, the white employee was terminated by AmEx.

52.     Upon information and belief, the employee was terminated because of his race and AmEx's race-based policies.

**AmEx Executives Put Its Racial Engineering Policies into Practice**

53.     During a company-wide town hall, in or about July 2020, Mr. Squeri gave a presentation with slides that showed the percentage of black employees in every single band within the company. Mr. Squeri stated that in every band the percentage of black employees must be increased to match that of the U.S. population by 2023. Mr. Squeri also stated that if employees were not happy with the quota system being implemented that they should find another place to work.

54.     At no point did Mr. Squeri bring up Equal Employment Opportunity guidelines or a commitment to uphold non-discrimination legal requirements when discussing his race-conscious policies.

55.     Mr. Squeri also announced that employees would be allowed to go back and change their racial identity in the company's files.

56.     Additionally, Mr. Squeri stated that AmEx had recently done a "pay equity" audit which found any disparity in pay between races to be "statistically insignificant." Despite this Mr. Squeri said he would again review the pay of all "people of color" (read "black") in the company to assure parity. This review ended with pay raises for many black employees but not white employees.

57.     The policies instituted by AmEx gave preferential treatment to individuals for being black and unambiguously signaled to white employees that their race was an impediment to getting ahead in the company.

58.     Upon information and belief, executives were given the go-ahead to increase the number of black employees in the desired bands and reduce the percentage of white employees without any regard for anti-discrimination laws.

59.     In or about October 2020 AmEx promoted a black director, Malcolm Browne, to VP/GM of Foreign Exchange and International Payments ("FXIP") in one of its largest groups, Global Commercial Services ("GCS"). Upon information and belief, soon after obtaining this role Mr. Browne got rid of several non-black directors who were his direct reports and replaced them with three black individuals even though there were a disproportionate number of people of other races who were better qualified.

60.     Upon information and belief, Mr. Browne is the same executive who told his directors in a meeting that "we are only hiring black people from now on." Additionally, when one of his subordinates hired a minority who was not black Mr. Browne chastised him saying, "you hired the wrong minority."

61.     In another instance, upon information and belief, in or about September 2020 a Group President of another of AmEx's largest groups hired someone from an outside company to report directly to him. This took place during an explicit outside hiring freeze decree at AmEx, meaning that no executives from outside the company could be hired. Additionally, the Group President had preached for years about not hiring "job jumpers" (individuals who've worked at several companies in a short period of time). However, the hire had worked for three companies in the preceding four years but was still hired, in direct violation of the Group President's own policy. Both the Group President and his hire are black.

62.     Additionally, upon information and belief, the Group President had to create an entirely new position, Executive VP, to bring his hire into AmEx. This put the Executive VP directly above a white VP who was the Group President's previous direct report. The white VP had a meteoric rise in the company due to several successful projects.

63.     Upon information and belief, shortly after entering the position created just for her, the black Executive VP terminated the white VP and replaced him with a person of color.

64.     Upon information and belief, during a presentation the Executive VP bragged that her success at AmEx was due to her being a "triple-threat"—black, female, and lesbian.

65.     This was a common theme at AmEx once Mr. Squeri's policies started to permeate the company. Upon information and belief, in the aforementioned groups—which generate the majority of AmEx's revenue and have the largest number of employees—nine or more people of color were promoted in 2019/2020 to executive roles compared to only two or three whites. Upon information and belief, many highly qualified white applicants were overlooked for these promotions due to their race.

66.     Upon information and belief, AmEx's race-based policies caused a disproportionate decrease in the number of white employees hired or promoted into leadership roles.

67.     For white employees in the targeted bands the prospect of a promotion became grim no matter how qualified they were, especially if they were competing against black coworkers.

68.     Upon information and belief, when AmEx conducted rounds of mass layoffs in or about the third quarters of 2021 and 2022, respectively, white employees were let go in wildly disproportionate numbers. Conversely, black employees were retained at rates that far exceeded their representation within the affected bands. Indeed, upon information and belief, in some teams the only individuals who were not laid off were black.

69.     In another instance of AmEx's discriminatory policies, upon information and belief, a Senior VP brought in a woman from a different company with whom he had previously worked. Both are black. The Senior VP promoted the woman to a Director leadership position, with many employees working under her, even though, upon information and belief, she was completely unqualified for the position and there were many superior non-black candidates for the role.

70.     Upon information and belief, while in her new role the Director pushed to have a white subordinate hire the Director's chosen candidate for an open position. The candidate, who was black, was not qualified and a person of a different race was hired for the position. Upon information and belief, the Director created a new position with a six-figure salary just to bring in the candidate because she was black. All of this was approved by the Senior VP.

71.     Upon information and belief, soon after AmEx's "zero tolerance" policies were implemented a white senior VP and General Manager ("GM") was fired by AmEx

because her young daughter made an innocuous comment about a black doll in her doll collection which she was showing during a Zoom meeting.

72.     Upon information and belief, the GM attempted to have an endearing moment on a Zoom with her employees, as many managers did during the pandemic, to alleviate the stress and anxiety of social isolation. The GM had her young daughter with her and had her talk about the dolls she had in her collection. While discussing the various make-believe roles the dolls played she mentioned the black doll was the dishwasher, or a comment to that effect.

73.     Days later the GM was terminated by AmEx with a company-wide email announcing that the company would not tolerate "racially insensitive" statements. The individual who replaced the GM was black.

## CLASS ACTION ALLEGATIONS

74.     Plaintiffs bring this action on behalf of themselves and as a class action, pursuant to the provisions of Rules 23(a), (b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure on behalf of the following class (collectively, the "Class"):

**The Nationwide Class**

All past, present, or potential white employees of American Express in bands 30 and higher who, as a result of the operation of past, current, or planned policies and practices, have been, are being, or will be discriminated against in the terms and conditions of employment, including but not limited to recruitment, hiring, promotions, training, and discharge because of their race.

**The California Subclass**

All past, present, or potential white employees of American Express in bands 30 and higher, in the state of California, who, as a result of the operation of past, current, or planned policies and practices, have been, are being, or will be discriminated against in the terms and conditions of employment, including but not limited to recruitment, hiring, promotions, training, and discharge because of their race.

75.     Certification of Plaintiffs' claims for class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

76.     This action has been brought and may be properly maintained on behalf of the Class proposed herein under Federal Rule of Civil Procedure 23.

77.     <u>Numerosity</u>. Federal Rule of Civil Procedure 23(a)(1): The members of the Class and Subclass are so numerous and geographically dispersed that individual joinder of all class members is impracticable. While Plaintiffs are informed and believe that there are not less than thousands of members of the Class and Subclass, the precise number of class members is unknown to Plaintiffs, but may be ascertained from AmEx's books and records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, Internet postings, and/or published notice.

78.     <u>Commonality and Predominance</u>: Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3): This action involves common questions of law and fact, which predominate over any questions affecting individual class members, including, without limitation:

a.      whether Defendant engaged in the conduct alleged herein;

b.      whether Defendant's policies and practices amount to discrimination or preferential treatment on the basis of race;

c.      whether Defendant instituted policies and customs that created a racially intimidating work environment;

d.      whether Defendant created racial quotas for leadership positions;

e.      whether plaintiffs are entitled to declaratory relief that Defendant has violated 42 U.S.C. §§ 1981, 2000e, *et seq.*, and California Government Code § 12900, *et seq.*;

f.   whether equitable remedies, injunctive relief, compensatory damages, and punitive damages for the Class and Subclass are warranted, and;

g.   whether Defendant has failed to implement policies and procedures to prevent retaliation against employees who challenge discrimination in the workplace and failed to address complaints and conduct proper investigations.

79.   <u>Typicality</u>: Federal Rule of Civil Procedure 23(a)(3): Plaintiffs' claims are typical of the other class members' claims because, among other things, all class members were comparably injured through AmEx's wrongful conduct as described above.

80.   <u>Adequacy</u>: Federal Rule of Civil Procedure 23(a)(4): Plaintiffs are adequate class representatives because their interests do not conflict with the interests of the other members of the Class and Subclass they seek to represent; Plaintiffs have retained counsel competent and experienced in class action litigation; and Plaintiffs intend to prosecute this action vigorously. The Class and Subclass's interests will be fairly and adequately protected by Plaintiffs and their counsel.

81.   <u>Declaratory and Injunctive Relief</u>: Federal Rule of Civil Procedure 23(b)(2): AmEx has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Class and Subclass, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class and Subclass as a whole.

82.   <u>Superiority</u>: Federal Rule of Civil Procedure 23(b)(3): A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The class members have been damaged and are entitled to recovery as a result of Defendant's common, uniform, unfair, and discriminatory policies and practices. Further, individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties, and provides

the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

83. Alternatively, class certification with respect to particular issues is appropriate pursuant to Federal Rule of Civil Procedure 23(c)(4).

### CLAIMS OF REPRESENTATIVE PLAINTIFFS

**Brian Netzel**

84. Plaintiff Brian Netzel started working for AmEx in or about 2010. He was soon promoted from a salesperson to a specialist for corporate card sales. After a few years Mr. Netzel was again promoted to a client manager in the Global Merchant Network Services ("GMNS") group in AmEx's Phoenix office.

85. During his employment at AmEx Mr. Netzel consistently received positive reviews and won many awards, including for leadership.

86. As a band 35 client manager Mr. Netzel occupied one of the positions specifically targeted by Mr. Squeri and AmEx with their racially discriminatory policies.

87. In or about 2019 a new VP/GM was transferred to Mr. Netzel's group from the New York office. Upon information and belief, this executive, Therese Banks, had a bad reputation among her colleagues for her management style and was promoted at the insistence of the Group President, discussed above, rather than the executive directly above her (who was white and would normally be responsible for the promotion).

88. Upon information and belief, Ms. Banks was promoted solely due to her race.

89. In her new role Ms. Banks, who is black, preferentially treated and promoted black employees while creating a racially hostile work environment for white employees.

90. Upon information and belief, Ms. Banks explicitly stated on several occasions that the race of black candidates must be considered when making employment decisions. For instance, during one executive meeting Ms. Banks harshly criticized a white underling for a purely merit-based decision to not promote a black subordinate.

91.     Upon information and belief, at the time Ms. Banks was transferred to Mr. Netzel's office one out of the six directors under her were black.

92.     Upon information and belief, soon after Ms. Banks obtained her new role she harassed and bullied two white male directors out of their positions and replaced them by promoting two black managers. At the time, blacks represented less than 10% of the candidate pool.

93.     Upon information and belief, of the four director positions that opened up while Ms. Banks was VP/GM, three went to blacks. One position was kept open by Ms. Banks for approximately six months and eventually filled by a white candidate because no black candidate could be found during that time.

94.     Upon information and belief, Ms. Banks promoted several blacks to leadership positions even though they did not have a college degree. This is significant because Ms. Banks consistently told her team that she would not promote people to those roles without a degree.

95.     Upon information and belief, Ms. Banks denied promotions to multiple white candidates because they did not have a college degree.

96.     Upon information and belief, on at least one occasion, Ms. Banks forced a white subordinate to hire a black candidate over a white candidate even though the black candidate did not have a college degree and was less qualified.

97.     Additionally, Ms. Banks created an uncomfortable and racially hostile environment for her white employees. Ms. Banks' actions became worse after George Floyd's death and in the context of Mr. Squeri's racialized messaging and AmEx's mandated racial indoctrination trainings.

98.     After one of these trainings Mr. Netzel notified AmEx of his opposition to what he believed was the racially discriminatory nature of AmEx's recent actions and messaging.

99.     Upon information and belief, Ms. Banks' leadership style was to aggressively berate and harass white employees; many times during meetings in front of other workers. However, black employees were never subjected to the same treatment.

100.     Upon information and belief, Ms. Banks would also assign too many tasks to white employees and retaliate against them if they complained by chastising them and giving them poor performance reviews.

101.     Upon information and belief, Ms. Banks also held regular, racially segregated work meetings whose members referred to themselves as the "black girls magic" club and included several executives previously described in this complaint.

102.     On or about October 30, 2020, Mr. Netzel's employment was terminated by Ms. Banks. Mr. Netzel was terminated because of his race and because he spoke out against AmEx's racially discriminatory policies.

103.     Upon information and belief, Ms. Banks was one of the executives who received financial incentives from AmEx to reduce the percentage of whites in her department.

104.     All of Ms. Banks' actions as an executive were consistent with the expectations and policies promulgated by AmEx and encouraged by the company and Mr. Squeri.

105.     AmEx was aware of Ms. Banks' racially discriminatory conduct. AmEx was also aware that Ms. Banks—while in her executive role—engaged in continuous unlawful activity that violated various employment statutes and company policies. However, unlike Mr. Netzel and countless other white employees, AmEx did not take any disciplinary action against Ms. Banks, much less terminate her employment. This was solely due to Ms. Banks' race and AmEx's racist policies.

106.     On or about August 12, 2021 Mr. Netzel filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). On or about August 25, 2021

Mr. Netzel filed a supplemental charge of retaliation. On or about June 2, 2022 Mr. Netzel received a Notice of Right to Sue from the EEOC.

**Travis Smith**

107.    In or about March 2016, Plaintiff Travis Smith began working for AmEx as a band 30 individual contributor in sales with the Commercial Acquisition Group ("CAG") within GCS.

108.    In his first year Mr. Smith outperformed expectations by nearly doubling his new account acquisition goals and far exceeding his target in sales. Mr. Smith also showed promising leadership skills and in 2017 was promoted to a band 35 senior manager in CAG, leading a team of approximately 10 individuals.

109.    Because AmEx's values at that time reflected a commitment to meritocracy and awarded excellence, Mr. Smith fully dedicated himself to being a valued leader and contributor. At that time he believed that he would have a long and fruitful career at AmEx where his hard work would translate into success.

110.    However, things drastically changed after Mr. Squeri became the CEO.

111.    Previously, it was customary at AmEx for high-achieving individual contributors like Mr. Smith, who showed exemplary leadership abilities, to be promoted to director roles after a few years with the company. Based on this precedent Mr. Smith applied for a band 40 director role in CAG.

112.    Mr. Smith's first interview for the role went well and he was then set up for a second interview. This interview was with Malcolm Browne, mentioned earlier in this complaint.

113.    From the start of the interview Mr. Browne addressed Mr. Smith in a demeaning manner and harangued him with irrelevant questions that sought to make Mr. Smith feel inferior and unwanted. The interview ended with Mr. Browne telling Mr. Smith, "you are not worth my time."

114.    Upon information and belief Mr. Smith was treated that way by Mr. Browne because of his race.

115.    Mr. Smith started to experience ever-increasing racial hostility at AmEx after his interview with Mr. Browne.

116.    In or about late 2020 Mr. Smith wanted to fill an open role on his team. He proposed who he thought was the strongest candidate for the position to his director. However, the director rejected the candidate because they were white. When Mr. Smith objected to making hiring decisions based on race and repeated to his director that the candidate presented was the most qualified his director stated, "I don't care…I need a black female."

117.    Upon information and belief, the directive to only hire someone black came from Mr. Browne.

118.    Subsequently, Mr. Smith was subjected to repeated trainings and lectures which reminded him that there were too many white people in leadership positions at AmEx, that he was a racist and privileged because he was a white male and because he approached life with a colorblind mentality.

119.    During one of these trainings Mr. Smith spoke up and objected to being treated differently because of his race. His complaints were not investigated or even considered by AmEx.

120.    Upon information and belief, during this time Mr. Browne removed several white directors from their roles. Mr. Smith encouraged two of his team members to apply for a role as a director. Both were extremely qualified. Both were denied promotions which went to a black male who was not nearly as qualified but was personally chosen by Mr. Browne.

121.    When the white directors were eliminated, it left a leadership void that resulted in Mr. Smith having to report directly to Mr. Browne. This caused Mr. Smith to

experience extreme anxiety and terror given the racially hostile environment created by Mr. Browne with the full backing of AmEx. Despite this, Mr. Smith continued to lead his team to perform at a high level in order to support his family.

122.    Eventually, Mr. Smith applied for a promotion that he believed would help him avoid the consequences that befell his other white colleagues. Unfortunately, Mr. Browne ended up being one of the interviewers. Only minutes into the interview Mr. Browne began to belittle and bully Mr. Smith.

123.    After the interview Mr. Browne sent Mr. Smith a scathing email which continued to gaslight him, accusing Mr. Smith of "disrespect" and "rudeness," claiming he was "not fit for leadership" despite his objectively verifiable accomplishments. All of Mr. Browne's statements in the email were malicious and materially false.

124.    Upon information and belief, Mr. Smith was mistreated because of his race and because he spoke out against AmEx's racially discriminatory practices and policies.

125.    Upon information and belief, AmEx was aware of Mr. Browne's racially discriminatory conduct and helped to facilitate it.

126.    Mr. Browne's conduct was so outrageous that Mr. Smith was forced to seek leave under the Family and Medical Leave Act ("FMLA") as a result of the stress.

127.    At this point Mr. Smith realized that the intolerable, racially hostile conditions and unlawful retaliation at AmEx would only get worse. He knew that if he stayed at the company he would have to endure further fear, humiliation, and harassment as well as likely termination by Mr. Browne.

128.    Having no other reasonable choice, Mr. Smith made the difficult decision to resign from AmEx.

**Eric Langkamp**

129.    In or about April 2017, Plaintiff Eric Langcamp began working for AmEx as a band 35 manager of business development in GCS.

130.     In or about 2020 Mr. Langcamp, like all of his fellow coworkers, was subjected to racially discriminatory trainings and mandatory "town halls" from the CEO and management that accused him of having privilege because of his white skin.

131.     At the same time, while preaching that capitalism was racist, AmEx publicly announced to all of its employees that no one would be receiving merit or annual raises due to the financial impact of COVID.

132.     However, Mr. Langcamp soon found out that a member of his team, who was black, received a raise that year. Notably, of the 7 members on Mr. Langcamp's team, the individual who received a raise was the lowest performing and below his performance quota. None of the other members of Mr. Langcamp's team, who were all above their quotas, were black.

133.     Upon information and belief, when the black employee asked his director if he received the raise because of his race, the director confirmed that he did. This employee was so disgusted that AmEx gave him preferential treatment because of his race that he resigned from the company.

134.     Upon information and belief, AmEx gave raises to many other black employees while publicly telling workers that no one would be receiving them. No white employees received raises during this time.

135.     Soon after that AmEx was involved in a major scandal related to its sales practices. In response, the company instituted a series of rules for its salespeople that would result in $1,000 fines and penalties for each violation.

136.     However, just like its raises, AmEx enforced its sales rules in a racially discriminatory manner. Mr. Langcamp discovered that while his white coworkers were being fined and, in some cases terminated, for violating these rules—AmEx did not enforce these rules against his black coworkers who had committed demonstrable infractions.

137.    In or about May 2022, AmEx terminated approximately 70% of its sales department in GCS. Upon information and belief, the terminations were conducted in a racially discriminatory manner with white employees bearing the brunt of this burden and black employees being spared specifically because of their race.

138.    After seeing the majority of his white colleagues terminated, punished, and treated deplorably because of their race, the suffocating and hostile environment at AmEx became intolerable for Mr. Langcamp. As a result, he was forced to resign from the company in January 2022.

**Nancy Larson**

139.    Plaintiff Nancy Larson was constructively terminated by AmEx in June 2022 after 29 years with the company.

140.    In late 2019 she was a Director of Account Development covering the Los Angeles area and had a team of employees under her (the "LA Team"). Ms. Larson led multiple national initiatives and was a top performer in sales.

141.    During this time, Ms. Larson was hiring for an open position on her team. The candidates were a black male and a white male. Ms. Larson's VP, Monica Singh, pressured Ms. Larson to hire the black candidate in furtherance of AmEx's racial engineering policies.

142.    Upon information and belief, Ms. Singh was one of the executives who benefitted financially from making her department less white.

143.    The candidate Ms. Singh selected failed to meet performance expectations. When Ms. Larson attempted to take corrective action with him like any other employee in this situation Ms. Singh reprimanded her and told Ms. Larson she needs to be an "ally," stating that the employee should be given special treatment because of his race.

144.    When Ms. Larson objected to treating employees differently based on race Ms. Singh retaliated against her by giving her a poor performance review which negatively affected Ms. Larson's annual compensation.

145.    Although Ms. Larson was second among six directors in sales and received positive feedback from her team for her leadership skills Ms. Singh gave higher performance reviews to non-white leaders who performed significantly worse.

146.    Upon information and belief, Ms. Singh prioritized non-white leaders who implemented AmEx's racially discriminatory policies above those who excelled in their core job functions of leadership and sales.

147.    Ms. Singh made life difficult for Ms. Larson after she objected to giving preferential treatment to black employees. Ms. Singh continually criticized Plaintiff, undermined her ideas in front of other leaders, and rated her below her actual performance.

148.    During this time Ms. Larson noticed that whites in her department were being disproportionately denied job opportunities and promotions and were being subjected to inferior treatment.

149.    At one of AmEx's Critical Race Theory trainings, which Ms. Singh insisted on attending with Ms. Larson's team, employees were tasked with speaking about discrimination. A white woman who was dating a black man shared her story where she said she was not well received by her boyfriend's family because of her race. The woman was immediately shut down by Ms. Singh and prohibited from telling her story.

150.    Upon information and belief, Ms. Singh followed up with the woman to specifically tell her that "Steve" (the company's CEO) wants her to by an "ally, " that white privilege is real and that she, as a white woman, could not experience discrimination.

151.    Ms. Singh's conduct had a ripple effect on other white employees who began to fear that they too would be retaliated against if they spoke honestly about their

experiences. This was exacerbated by Ms. Singh constantly reminding these employees of Mr. Squeri's "vision" for the company which they had to endure for months on end.

152.    Ms. Larson faced continuing pressure from Ms. Singh to treat her workers differently based on race. On multiple occasions, when Ms. Larson attempted to manage the performance of her white employees she was told to manage them to a "new career," meaning "out" of AmEx. However, when it came to black employees, Ms. Larson received completely different feedback and was instructed to be an "ally."

153.    Ms. Larson's refusal to treat her workers differently based on race resulted in her transfer from the LA team to the Orange County team. However, the discriminatory and retaliatory conduct from Ms. Singh continued.

154.    Ms. Larson's position on the LA Team was given to a black outside hire. This new LA Director struggled to competently lead his workers, leading to many complaints against him. Ms. Singh blamed the LA Director's struggles on Ms. Larson, claiming that she did not support this Director sufficiently, even though Ms. Larson no longer had any connection to that team and did everything to help him succeed at the time of her departure.

155.    When Ms. Larson realized she would continue to be retaliated against for her opposition to AmEx's discriminatory policies she applied for a transfer to a similar sales position in Austin, TX.

156.    One of the people who conducted the interview was Therese Banks, previously mentioned herein. During the interview Ms. Banks acted dismissively and condescended to Ms. Larson because she did not have a college degree.

157.    The reason Ms. Larson did not have a degree is because she had to leave college at the age of 21 to support her then-husband and raise her son. Despite this she was able to become a top-performing salesperson and accomplished leader at a time when AmEx rewarded merit. Additionally, a college degree should have been irrelevant because

Ms. Larson was applying for the same position she was already succeeding at, just in a different location.

158.    Ms. Banks ended up giving the Austin job to a younger black male with no sales experience.

159.    Sometime before her own interview with Ms. Banks, Ms. Larson had referred a white candidate with eight years of sales experience for a sales role in Ms. Banks' organization. Upon information and belief, Ms. Banks declined to even interview the candidate, who did not have a college degree, and instead gave the job to a black candidate who just graduated college and had no sales experience.

160.    This was yet another instance where Ms. Banks discriminated against a white employee using the pretext of a college degree as a requirement (she notably promoted several blacks without a degree).

161.    AmEx's discriminatory policies and practices shut Ms. Larson out from advancement and compensation commensurate with her performance and created an intolerably hostile environment because she is white.

162.    Having no other reasonable choice, Ms. Larson was forced to resign from AmEx in June 2022.

163.    On or about September 9, 2022 Ms. Larson filed an administrative charge against AmEx and received a Notice of Right to Sue from the California Department of Fair Employment and Housing ("DFEH") pursuant to the California Fair Employment and Housing Act.

///

///

///

**CAUSES OF ACTION**

**COUNT 1 – VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**
**(42 U.S.C. 2000e, *et seq.*) AND 42 U.S.C. § 1981**
**Unlawful Race Discrimination**
**(On behalf of all Plaintiffs and the Class)**

164.    Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint as if fully set forth herein.

165.    This claim is brought by Individual and Representative Plaintiffs on behalf of themselves and the Class they represent.

166.    Defendant has engaged in an intentional, company-wide, and systematic pattern and/or practice of discrimination against non-black—and specifically white—employees in bands 30 and higher.

167.    Defendant has engaged in an intentional, company-wide, and systematic pattern or practice of discrimination against its employees by, among other things:

    a.    Creating racial quotas for leadership positions at AmEx;

    b.    Giving executives financial incentives for reducing the number of white employees in their departments;

    c.    Giving preferential treatment to black employees in hiring, promotions, salary, and other terms and conditions of employment;

    d.    Requiring employees to make hiring and promotion decisions based on race and disciplining or chastising employees who refused to comply;

    e.    Targeting white employees for harassment during AmEx's "diversity" trainings, executive "town halls," and through its "see something, say something" policies;

    f.    Engaging in disparate treatment of white employees for termination and discipline.

168.    Defendant's invidious race discrimination adversely affected the terms, conditions, and privileges of Plaintiffs' and the Class's employment.

169.    Defendant's discriminatory conduct created an intolerable working environment for Plaintiffs and the Class.

170.    As a further direct and proximate result of said unlawful employment practices Plaintiffs and the Class suffered the indignity of discrimination and invasion of their right to be free from discrimination.

171.    As a further direct and proximate result of said unlawful employment practices, Plaintiffs suffered extreme emotional distress, shame, intimidation, humiliation, indignation, embarrassment, and fear.

172.    Defendant's discriminatory and unlawful employment practices identified in this complaint have been intentional, deliberate, willful, systematic, and conducted in callous disregard of the federally protected rights of Plaintiffs and the Class. As a result, Plaintiffs and the Class are entitled to compensatory and punitive damages.

**COUNT 2 – VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**
**(42 U.S.C. 2000e, *et seq.*) AND 42 U.S.C. § 1981**
**<u>Unlawful Racial Harassment/Hostile Environment</u>**
**(On behalf of all Plaintiffs and the Class)**

173.    Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint as if fully set forth herein.

174.    Defendant's policies and practices created a working environment heavily charged with racial discrimination and intimidation. These policies and practices subjected Plaintiffs and the Class to a racially hostile work environment.

175.    As a further direct and proximate result of said unlawful employment practices Plaintiffs and the Class suffered the indignity of discrimination and invasion of their right to be free from discrimination.

176.   As a further direct and proximate result of said unlawful employment practices, Plaintiffs suffered extreme emotional distress, shame, intimidation, humiliation, indignation, embarrassment, and fear.

177.   Defendant's discriminatory and unlawful employment practices identified in this complaint have been intentional, deliberate, willful, systematic, and conducted in callous disregard of the federally protected rights of Plaintiffs and the Class. As a result, Plaintiffs and the Class are entitled to compensatory and punitive damages.

**COUNT 3 – VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964
(42 U.S.C. 2000e,** *et seq.***) AND 42 U.S.C. § 1981**
**Retaliation**
**(On behalf of Plaintiffs Netzel, Smith, and Larson, individually)**

178.   Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint as if fully set forth herein.

179.   When Plaintiffs complained about AmEx's racially discriminatory policies, practices, and hostile environment Defendant retaliated against them for their protected civil rights activity.

180.   Defendant took adverse action against Plaintiffs with the purpose of retaliating against them because of their participation in protected activity, and Plaintiffs suffered damages as a result of the that conduct.

181.   As a further direct and proximate result of said unlawful employment practices, Plaintiffs suffered extreme emotional distress, shame, intimidation, humiliation, indignation, embarrassment, and fear.

182.   Defendant's discriminatory and unlawful employment practices identified in this complaint have been intentional, deliberate, willful, systematic, and conducted in callous disregard of the federally protected rights of Plaintiffs. As a result, Plaintiffs are entitled to compensatory and punitive damages.

**COUNT 4 – VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**
**(42 U.S.C. 2000e, *et seq.*) AND 42 U.S.C. § 1981**
**<u>Constructive Discharge</u>**
**(On behalf of Plaintiffs Smith, Langkamp, and Larson, individually)**

183.    Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint as if fully set forth herein.

184.    Defendant's discriminatory conduct created an intolerable working environment for Plaintiffs, leading to their constructive discharge.

185.    As a further direct and proximate result of said unlawful employment practices, Plaintiffs suffered extreme emotional distress, shame, intimidation, humiliation, indignation, embarrassment, and fear.

186.    Defendant's discriminatory and unlawful employment practices identified in this complaint have been intentional, deliberate, willful, systematic, and conducted in callous disregard of the federally protected rights of Plaintiffs. As a result, Plaintiffs are entitled to compensatory and punitive damages.

**COUNT 5 – VIOLATION OF FEHA, CALIFORNIA GOVERNMENT CODE §**
**12900, *et seq.***
**<u>Discrimination on the Basis of Race</u>**
**(On behalf of Nancy Larson and the California Subclass)**

187.    Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint as if fully set forth herein.

188.    At all relevant times AmEx was an employer covered by the Fair Employment and Housing Act ("FEHA"), and Plaintiff Nancy Larson and the California Subclass were covered employees.

189.    Defendant has engaged in an intentional, company-wide, and systematic pattern and/or practice of discrimination against non-black—and specifically white—employees in bands 30 and higher.

190.   Defendant has engaged in an intentional, company-wide, and systematic pattern or practice of discrimination against its employees by, among other things:

    a.   Creating racial quotas for leadership positions at AmEx;

    b.   Giving executives financial incentives for reducing the number of whites in their departments;

    c.   Giving preferential treatment to black employees in hiring, promotions, salary, and other terms and conditions of employment;

    d.   Requiring employees to make hiring and promotion decisions based on race and disciplining or chastising employees who refused to comply;

    e.   Targeting white employees for harassment during AmEx's "diversity" trainings, executive "town halls," and through its "see something, say something" policies;

    f.   Engaging in disparate treatment of white employees for termination and discipline.

191.   Defendant's invidious race discrimination adversely affected the terms, conditions, and privileges of Plaintiff's and the California Subclass' employment.

192.   Defendant's discriminatory conduct created an intolerable working environment for Plaintiff and the California Subclass.

193.   As a further direct and proximate result of said unlawful employment practices Plaintiff and the California Subclass suffered the indignity of discrimination and invasion of their right to be free from discrimination.

194.   As a further direct and proximate result of said unlawful employment practices, Plaintiff suffered extreme emotional distress, shame, intimidation, humiliation, indignation, embarrassment, and fear.

195.   Defendant's discriminatory and unlawful employment practices identified in this complaint have been intentional, deliberate, willful, systematic, and conducted in

callous disregard of the legally protected rights of Plaintiff and the California Subclass. As a result, Plaintiff and the California Subclass are entitled to compensatory and punitive damages.

### COUNT 6 – VIOLATION OF FEHA, CALIFORNIA GOVERNMENT CODE § 12900, *et seq.*
### <u>Harassment on the Basis of Race</u>
### (On behalf of Nancy Larson and the California Subclass)

196.    Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint as if fully set forth herein.

197.    FEHA provides that it is unlawful for an employer to harass an employee because of, inter alia, the employee's gender and/or race.

198.    Furthermore, it is unlawful to harass an employee for informing management about possible violations of the law.

199.    Defendant's policies and practices created a working environment heavily charged with racial discrimination and intimidation. These policies and practices subjected Plaintiff and the California Subclass to a racially hostile work environment.

200.    AmEx treated Plaintiff in a discriminatory and harassing manner after she objected to AmEx's unlawful policies.

201.    As a further direct and proximate result of said unlawful employment practices Plaintiff and the California Subclass suffered the indignity of discrimination and invasion of their right to be free from discrimination.

202.    Defendant's invidious race discrimination adversely affected the terms, conditions, and privileges of Plaintiff's and the California Subclass' employment.

203.    Defendant's discriminatory conduct created an intolerable working environment for Plaintiff and the California Subclass.

204.    AmEx's conduct was a substantial factor in causing harm to Plaintiff and the California Subclass.

205.    As a further direct and proximate result of said unlawful employment practices, Plaintiff suffered extreme emotional distress, shame, intimidation, humiliation, indignation, embarrassment, and fear.

206.    Defendant's discriminatory and unlawful employment practices identified in this complaint have been intentional, deliberate, willful, systematic, and conducted in callous disregard of the legally protected rights of Plaintiff and the California Subclass. As a result, Plaintiff and the California Subclass are entitled to compensatory and punitive damages.

**COUNT 7 – VIOLATION OF FEHA, CALIFORNIA GOVERNMENT CODE §
12900, *et seq.***
**<u>Failure to Prevent Discrimination, Harassment, and Retaliation</u>**
**(On behalf of Nancy Larson and the California Sublcass)**

207.    Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint as if fully set forth herein.

208.    At all relevant times, AmEx was required, but failed, to take all reasonable steps necessary to prevent discrimination, harassment, and retaliation under California Government Code § 12940(k), *et seq.*

209.    However, AmEx's pattern and practice was to implement and encourage discrimination, harassment, and retaliation against Plaintiff and the California Subclass.

210.    Defendant's policies and practices constituted failure to prevent discrimination, harassment, and retaliation under FEHA.

211.    As a direct and proximate result of said unlawful employment practices, Plaintiff suffered extreme emotional distress, shame, intimidation, humiliation, indignation, embarrassment, and fear.

212.    Defendant's discriminatory and unlawful employment practices identified in this complaint have been intentional, deliberate, willful, systematic, and conducted in callous disregard of the legally protected rights of Plaintiff and the California Subclass. As a

result, Plaintiff and the California Subclass are entitled to compensatory and punitive damages.

**COUNT 8 – VIOLATION OF FEHA, CALIFORNIA GOVERNMENT CODE §**
**12900,** *et seq.*
**<u>Retaliation in Violation of FEHA</u>**
**(On behalf of Nancy Larson, individually)**

213.   Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint as if fully set forth herein.

214.   California Government Code § 12940(h) provides that it is unlawful for any employer or person to discriminate against any person because the person has opposed any practices forbidden under the Fair Employment and Housing Act, Government Code § 12940, *et seq.*

215.   Plaintiff opposed AmEx's racially discriminatory practices and policies in violation of California Government Code § 12940 *et seq.* by complaining to her supervisors on several occasions.

216.   In retaliation for objecting to such unlawful conduct in violation of FEHA, AmEx took adverse employment action against Plaintiff by providing her with decreased performance reviews, stifling her ability to advance in the company, and reprimanding and undermining her verbally and in writing for not going along with AmEx's policy of discrimination.

217.   Defendant took adverse action against Plaintiff with the purpose of retaliating against her because of her participation in protected activity, and Plaintiff suffered damages as a result of the that conduct.

218.   As a further direct and proximate result of said unlawful employment practices, Plaintiff suffered extreme emotional distress, shame, intimidation, humiliation, indignation, embarrassment, and fear.

219.     Defendant's discriminatory and unlawful employment practices identified in this complaint have been intentional, deliberate, willful, systematic, and conducted in callous disregard of the legally protected rights of Plaintiff. As a result, Plaintiff is entitled to compensatory and punitive damages.

## COUNT 9 – RETALIATION IN VIOLATION OF PUBLIC POLICY
### _Tameny_ Retaliation
**(On behalf of Nancy Larson, individually)**

220.     Plaintiffs repeat and realleges each of the foregoing allegations in this Complaint as if fully set forth herein.

221.     Punishing employees in retaliation for resisting the violations of laws that secure important public policies contravenes those policies and gives rise to a common law action in tort.

222.     Defendant took adverse action against Plaintiff with the purpose of retaliating against her because of her participation in protected activity, and Plaintiff suffered damages as a result of the that conduct.

223.     As a further direct and proximate result of said unlawful employment practices, Plaintiff suffered extreme emotional distress, shame, intimidation, humiliation, indignation, embarrassment, and fear.

224.     Defendant's discriminatory and unlawful employment practices identified in this complaint have been intentional, deliberate, willful, systematic, and conducted in callous disregard of the legally protected rights of Plaintiff. As a result, Plaintiff is entitled to compensatory and punitive damages.

///

///

///

**COUNT 10 – VIOLATION OF FEHA, CALIFORNIA GOVERNMENT CODE §
12900,** *et seq.*
**<u>Constructive Discharge</u>**
**(On behalf of Nancy Larson, individually)**

225.    Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint as if fully set forth herein.

226.    Defendant's discriminatory conduct created an intolerable working environment for Plaintiff, leading to her constructive discharge.

227.    As a further direct and proximate result of said unlawful employment practices, Plaintiff suffered extreme emotional distress, shame, intimidation, humiliation, indignation, embarrassment, and fear.

228.    Defendant's discriminatory and unlawful employment practices identified in this complaint have been intentional, deliberate, willful, systematic, and conducted in callous disregard of the legally protected rights of Plaintiff. As a result, Plaintiff is entitled to compensatory and punitive damages.

**COUNT 11 – UNFAIR COMPETITION**
**<u>Cal. Bus. & Prof. Code § 17200,</u>** *<u>et seq.</u>*
**(Against all Defendants)**

229.    Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint as if fully set forth herein.

230.    California's Unfair Competition Law (the "UCL") defines unfair competition to include any "unlawful, unfair, or fraudulent" business act or practice. Cal. Bus. & Prof. Code §§ 17200 *et seq.* Defendant's conduct constitutes unfair competition under the UCL.

231.    Defendant engaged in "fraudulent" business practices because its public nondiscrimination statements are likely to mislead the public into believing that AmEx does not have policies that give preferential treatment on the basis of race.

232.   Defendants engaged in "unlawful" and "unfair" business practices because they violated the laws and underlying legislative policies designed to prevent racial discrimination in employment and business transactions.

233.   Plaintiffs were injured in fact and lost money or property as a result of these unlawful, unfair, and fraudulent business practices.

### COUNT 12 – DECLARATORY RELIEF
### (Against all Defendants)

234.   Plaintiffs repeat and reallege each of the foregoing allegations in this Complaint as if fully set forth herein.

235.   An actual controversy has arisen and now exists between the parties relating to the legal rights and duties of the parties as set forth above, for which Plaintiffs and the Class and Subclass desire a declaration of rights and other relief available.

236.   A declaratory judgment is necessary and proper in that Plaintiffs and the Class and Subclasses contend that Defendant has committed and continues to commit the violations set forth above and, on information and belief, Defendant will deny that it has done so and/or will continue to commit such acts.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all claims so triable.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment as follows:

A.   An order certifying the proposed Class and Subclass, appointing the named Plaintiffs as the representatives of the Class and Subclass, and appointing the law firms representing the named Plaintiffs as counsel for the Class and Subclass.

B.  General and compensatory damages for Plaintiffs and the Class and Subclass for the violations of their federal statutory rights, emotional distress, humiliation, and anguish, all according to proof.

C.  An order reinstating Plaintiffs and the Class members to their rightful positions at AmEx or, in lieu of reinstatements, an order for front pay benefits.

D.  Punitive damages, according to proof.

E.  A declaration that Defendant, through the actions, omissions, policies, practices, and/or procedures complained of, violate 42 U.S.C. §§ 1981, 2000e, *et seq.*, California Government Code § 12900, *et seq.*, and California Bus. & Prof. Code § 17200, *et seq.*

F.  Public injunctive relief requiring Defendant, its successors in office, agents, employees, and assigns, and all persons acting in concert with them, to eliminate policies, customs, and/or practices that discriminate or give preferential treatment to individuals or entities based on race.

F.  Attorneys' fees, costs, interest, and expenses pursuant to 42 U.S.C. §1988, California Government Code § 12965(b), California Code of Civil Procedure § 1021.5, and other relevant statutes.

G.  And such other and further relief as the Court may deem proper.


DATE:  November 21, 2022                    THE PIVTORAK LAW FIRM


By:  _____
     DAVID PIVTORAK
     Attorney for Plaintiffs