**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Brian Netzel, et al., | No. CV-22-01423-PHX-SMB |
| Plaintiffs, | **ORDER** |
| v. | |
| American Express Company, et al., | |
| Defendants. | |

Pending before the Court is Defendant American Express Company's ("AmEx") Motion to Compel Arbitration and Dismiss the Second Amended Complaint. (Doc. 22.) Plaintiffs Brian Netzel, Travis Smith, Eric Langkamp, and Nancy Larson (collectively "Plaintiffs") filed a Response (Doc. 33), and AmEx filed a Reply (Doc. 37). The Court exercises its discretion to resolve this motion without oral argument. *See* LRCiv 7.2(f) (The Court may decide motions without oral argument."). After reviewing the arguments and relevant law, the Court will grant AmEx's Motion for the following reasons.

**I.      BACKGROUND**

AmEx is a "global, multi-billion dollar financial services firm with over 60,000 employees." (Doc. 19 at 2.) Plaintiffs are all former AmEx employees who began working for AmEx in the following years: Netzel, 2010; Smith, 2016; Langkamp, 2017; and Larson, 1993. (*Id.* at 17, 20, 22; Doc. 22-1 at 3.) Plaintiffs allege AmEx implemented policies to hire and maintain a percentage of African American employees to be comparable to that of the United States population. (Doc. 19 at 2.) Plaintiffs allege AmEx provided executives

1 with financial incentives to "decrease the percentage of white employees in their departments" and punished employees who were unwilling to make employment decision based on race. (*Id.* at 2–3.) AmEx allegedly discriminated against white employees when it came to layoffs and "repeatedly instructed its workers that black employees and customers were to be given favorable treatment." (*Id.* at 3.) As a result of these practices, Plaintiffs allege they were terminated or forced to resign. (*Id.* at 19, 22, 24, 27.)

Plaintiffs filed this class action lawsuit alleging multiple claims on their own behalf, and on behalf of a similarly situated class of AmEx employees for unlawful race discrimination (Plaintiffs and the Class), unlawful racial harassment/hostile environment (Plaintiffs and the Class), retaliation (Netzel, Smith, and Larson), and constructive discharge (Smith, Langkamp, and Larson) under Title VII of the Civil Rights Act of 1964. (*Id.* at 28–31.) Larson, individually and on behalf of a California Subclass of AmEx employees, also brings claims for racial discrimination, racial harassment, failure to prevent discrimination, harassment, and retaliation under California Government Code § 12900 *et seq*. (*Id.* at 31–35.) Larson individually also brings claims for retaliation and constructive discharge under California Government Code § 12900 *et seq.*, and a claim for *Tameny* retaliation under California public policy. (*Id.* at 35–37.) Plaintiffs bring a claim for unfair competition under the California business and professional code and seek declaratory relief. (*Id.* at 37–38.)

In 2003 AmEx implemented an arbitration policy as a condition of employment. (Doc. 22-1 at 3.) The policy required all employees to submit employment-related disputes to mandatory arbitration. (*Id.*) The policy applied initially to employees hired on or after June 1, 2003. (*Id.*) In 2007, AmEx amended its arbitration policy to include all employees hired before June 1, 2003, but allowed such employees to opt out. (*Id.*) The arbitration policy that employees agreed to be covered under, except for those employees who were able to, and actually did, opt out states:

> The agreement between each individual and American Express to be bound by the Policy creates a contract requiring both parties to resolve all employment-related disputes that are based on a legal claim through final and binding arbitration. Arbitration is the exclusive forum for the resolution

> of such disputes and the parties mutually waive their right to a trial before a judge or jury in federal or state court in favor of arbitration . . . [unless] the parties [otherwise] mutually agree. . . . "Covered Claims" include, but are not limited to: 1. discrimination or harassment on the basis of race.

(*Id.* at 19–20.)

Netzel, Smith, and Langkamp began their employment after June 1, 2003 and accordingly signed acknowledgement forms upon commencement of their employment. (*See id.* at 45, 47, 49.) Larson, whose employment predated implementation of the policy, was provided an opportunity to opt out, but she never submitted an opt out form. (*See id.* at 3–5.) AmEx now moves to compel arbitration.

## II.     LEGAL STANDARD

The Federal Arbitration Act ("FAA") provides that written agreements to arbitrate disputes "shall be valid, irrevocable, and enforceable, save upon such grounds that exist at law or in the equity for the revocation of a contract." 9 U.S.C. § 2; *see also AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (discussing the liberal federal policy favoring valid arbitration agreements). The FAA "leaves no room for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed." *Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 218 (1985). "The court's role is to answer two gateway questions: does a valid agreement to arbitrate exist, and does the agreement encompass the dispute at issue." *Adams v. Conn Appliances Inc.*, No. CV-17-00362-PHX-DLR, 2017 WL 3315204, at *1 (D. Ariz. Aug. 3, 2017) (citing *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000)). If so, the court must compel arbitration. *Id.*

"Where a contract contains an arbitration clause, courts apply a presumption of arbitrability as to particular grievances, and the party resisting arbitration bears the burden of establishing that the arbitration agreement is inapplicable." *Wynn Resorts, Ltd. v. Atl.-Pac. Cap., Inc.*, 497 Fed. Appx. 740, 742 (9th Cir. 2012). However, state law is not entirely displaced from federal arbitration analysis because "generally applicable contract defenses, such as fraud, duress, or unconscionability, may be applied to invalidate arbitration

agreements without contravening § 2 [of the FAA]." *Ticknor v. Choice Hotels Int'l, Inc.*, 265 F.3d 931, 936–37 (9th Cir. 2001) (citing *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 686 (1996)).

## III. DISCUSSION

### A. Governing Law

Before conducting its analysis, the Court must first determine the applicable law. The Policy states it "shall be governed by and construed and enforced in accordance with the laws of the State of New York without regard to principles of conflicts of laws." (Doc. 22-1 at 21.) Plaintiffs assert that despite this choice of law provision, the Court should instead apply California law. (Doc. 33 at 5.) "[F]ederal courts sitting in diversity must apply the forum state's choice-of-law rules to determine the controlling substantive law." *R & L Ltd. Invs., Inc. v. Cabot Inv. Props., LLC*, 729 F. Supp. 2d 1110, 1113 (D. Ariz. 2010). The Court will thus apply Arizona's choice of law rules to determine the parties' substantive disputes.

Arizona follows the Restatement (Second) of Conflict of Laws § 187 which states:
The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either

(a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

(b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Restatement (Second) of Conflict of Laws § 187(2) (1988)). "When the parties choose the law of a particular state to govern their contractual relationship and the chosen law has

- 4 -

some nexus with the parties or the contract, that law will generally be applied." *Effio v. FedEx Ground Package*, No. cv-08-1522-PHX-ROS, 2009 WL 775408, at *1 (D. Ariz. Mar. 20, 2009) (quoting *Nanini v. Nanini*, 802 P.2d 438, 441 (Ariz. Ct. App. 1990)). Plaintiffs assert the second exception applies. (Doc. 33 at 5.) Specifically, Plaintiffs contend the application of New York law is contrary to a fundamental policy of California "against enforcing the contractual waiver of the right to seek public injunctive relief in any forum." (*Id.*)

Plaintiffs argue California law should govern the enforceability of the arbitration agreements because under *McGill v. Citibank, N.A.*, 393 P.3d 85 (Cal. 2017), California prohibits contracts that waive a party's right to pursue public injunctive relief. (Doc. 33 at 5.) *McGill* represents California's fundamental public policy against the enforcement of contractual waivers of a party's right to seek public injunctive relief. 393 P.3d at 90. Plaintiffs also argue California has a greater material interest in this case because the case's facts are tied more to California than to New York. (*Id.* at 6–7.) Larson is a California resident that has lived and worked in California for twenty-five years. (*Id.* at 7.) A "substantial portion" of Netzel's portfolio involved California clients, and Smith was tasked with targeting California customers. (*Id.*) Plaintiffs do not specify Langkamp's ties to California, but assert New York has no interest in this case because California's residents were impacted "by AmEx's applied bigotry within California's borders." (*Id.*)

AmEx disputes Plaintiffs' contacts with California. AmEx asserts neither Netzel, Langkamp, nor Smith lived or worked in California during their employment. (Doc. 37 at 2.) But AmEx does recognize that Larson worked for AmEx from her home in California. (*Id.*) AmEx disputes Plaintiffs' attempts to tie this case to California's protection of public injunctive relief. (*See id.* at 3.) Citing *McGill*, AmEx asserts Plaintiffs do not actually seek public injunctions. (*Id.* at 3, 5.) Instead, AmEx asserts *McGill* is inapplicable because Plaintiffs seek injunctive relief on their own behalf, instead of the public at large. (*Id.* at 5–6.) As to "materially greater interest," AmEx asserts New York has a greater interest in this case because it is headquartered there, the policies were crafted there, and its

1 obligations under the arbitration policy were to be carried out there.  (*Id.* at 3.)

2      Even assuming the prohibition of public injunctions is a "fundamental policy" of California, the Court finds Plaintiffs have failed to establish that California has a greater material interest in the enforceability of the arbitration agreements.  Plaintiffs imply, but do not articulate, that California law would have been applicable in the absence of the parties' choice of New York law provision.  While Larson is a California resident, and both Netzel and Smith serviced some California clients, the contacts at issue here "are so widely dispersed that determination of the state of the applicable law without regard to the parties' choice would present real difficulties."  Restatement (Second) of Conflict of Laws § 187 cmt. g (1988).  Netzel and Smith appear to work out of AmEx's Arizona office (*see* Doc. 22-1 at 45–47), and Langkamp appears to work out of Pennsylvania (*see id.* at 49).  (*See also* Doc. 37 at 16–17.)  AmEx is headquartered in New York and its officers crafted the company's allegedly discriminatory policies there.  AmEx also asserts it employs about 6,000 more employees in New York than in California.  (Doc. 37 at 15 ¶ 4.)  Based on these widely dispersed contacts, the Court cannot conclude that California law would been the state of applicable law absent the New York choice of law provision.  *See* Restatement (Second) of Conflict of Laws § 187(2)(b).

     The Court also agrees with AmEx that Plaintiffs do not seek public injunctive relief as contemplated in *McGill*.  "Public injunctive relief is 'relief that by and large benefits the general public . . . and that benefits the plaintiff, if at all, only incidentally and/or as a member of the general public.'"  *DiCarlo v. MoneyLion, Inc.*, 988 F.3d 1148, 1152 (9th Cir. 2021) (quoting *McGill*, 393 P.3d at 89).  Plaintiffs do not seek relief with the purpose of prohibiting unlawful acts that threaten the general public with future injury.  *See McGill* 393 P.3d at 90.  Plaintiffs instead seek to redress their specific injuries and injuries to "a group of individuals similarly situated" to Plaintiffs.  *Id.*  Such relief does not constitute public injunctive relief, and the Court finds *McGill* does not apply.  The Court will thus apply New York law as contemplated by the agreements.

**B.     Notice**

The parties next dispute whether Larson received sufficient notice to be bound by AmEx's arbitration policy. (Doc. 33 at 10–11.) AmEx expanded its arbitration policy to all its employees in 2007. (Doc. 22 at 5.) Larson's employment predated that policy change. (*See* Doc. 22-1 at 3 ¶ 5.) AmEx states it emailed Larson to inform her that she would have forty-five days to opt out of the arbitration policy. (Doc. 22 at 5; 22-1 at 23–24.) AmEx then states it sent a packet with the policy and an opt out form to her home address. (Doc. 22 at 5.) AmEx received a return receipt from the United States Postal Service showing the packet was delivered to Larson's home on August 20, 2007, but that AmEx never received a completed opt out form from Larson. (*Id.* at 6; Doc. 22-1 at 41.) Laron denies ever receiving the email or packet about AmEx's arbitration policy and asserts she "would have certainly opted out." (Doc. 33-5 at 3–4.) Larson includes that she does not recognize the signature on AmEx's return receipt and that she was "likely in North Dakota . . . or in Disney World." (*Id.* at 4.) Thus, Plaintiffs contend the policy does not apply to Larson because she never received notice. (Doc. 33 at 10–11) (citing *Weiss v. Macy's Retail Holdings, Inc.*, 741 Fed. App'x 24, 27 (2d. Cir. 2018). AmEx responds that in addition to the first email and certified mail packet, it also sent a follow up email presenting some frequently asked questions about the policy to help employees "make a fully informed and timely decision." (Doc. 37 at 30.) AmEx also provided a memo with direct deposit statements that reminded employees of the looming deadline to opt out of the arbitration policy. (*Id.* at 18, 33.)

Plaintiffs challenge AmEx's reliance on its employee Jeanne Stout's declaration under Federal Rule of Evidence 803(6), claiming the emails lack foundation and arguing Stout is neither a custodian or a qualified witness. (Doc. 33 at 18.) Specifically, Plaintiffs contend a description is lacking on the "mechanism of electronic delivery or receipt—or the document she purports to authenticate." The Court disagrees. "All that is required is that the witness [be] familiar with the record keeping procedures of the organization." *AngioDynamics, Inc. v. C.R. Bard, Inc.*, 1:17-cv-598 (BKS/CFH), 2022 WL 4225170, at

*2 (N.D.N.Y. Sept. 13, 2022) (cleaned up). Stout included in her declaration that she is "familiar with records maintained by American Express in the normal course of business with regard to human resources matters, including new hire documents and the Company's Employment Arbitration Policy." (Doc. 22-1 at 2 ¶ 4.) Stout's declaration satisfies the requirements under Rule 803(6)(D), and the Court will consider Stout's declaration and the related emails for the analysis presented below.

Under New York law, the parties' conduct can lead to an inference of a binding agreement. *Brown v. St. Paul Travelers Cos., Inc.*, 331 Fed. App'x 68, 70 (2d. Cir. 2009). New York law also provides for a rebuttable presumption that an employee received notice when that notice was properly addressed and mailed. *See Macy's*, 741 Fed. App'x at 27. The presumption may be rebutted with evidence that the document was never received. *Id.* The Court is unpersuaded by Larson's attempts to rebut this presumption. Though Larson claims she never received the emails, and despite describing her custom and practice of doing so, she does not argue that she would not have been included in the group of addressees described in the email. Her mere denial of ever receiving the email is simply insufficient. *See Charter Commc'ns., Inc. v. Garfin*, 20 Civ. 7049 (KPF), 2021 WL 694549, at *9 n.6 (S.D.N.Y. Feb. 23, 2021). And while Larson states the signature on the packet's return receipt is unrecognizable to her, she does not dispute that the packet was signed for at her address. In total, the Court finds Larson has not sufficiently rebutted the presumption that she received notice of the arbitration agreement.

### C. Validity

AmEx asserts Plaintiffs must be compelled to arbitrate their claims because they are subject to valid arbitration agreements that encompass all their claims. (Doc. 22 at 8.) Plaintiffs challenge the enforceability of the agreements but not their validity. The Court finds no issue with the arbitration agreements' validity and finds Plaintiffs' claims are entirely within its scope. The agreements terms provide that the parties must "resolve all employment-related disputes that are based on a legal claim through final and binding arbitration." (Doc. 22-1 at 9.) The agreements also specifically cover claims for

1 discrimination on the basis of race (*see id.* at 10) as alleged in the Second Amended
2 Complaint (*see* Doc. 19 at 10–14.) Plaintiffs' claims are within the agreements' scope and
3 their claims are subject to arbitration unless they can establish the agreements are
4 unenforceable. *See* 9 U.S.C. § 2.

### D. Unconscionability

Plaintiffs claim the arbitration agreements are unenforceable because they are permeated with unconscionability. (Doc. 33 at 11–12.) Agreements under New York law are unconscionable only if the agreement is both procedurally and substantively unconscionable at formation. *Mumin v. Uber Techs., Inc.*, 239 F. Supp. 3d 507, 525 (E.D.N.Y. 2017). Procedural unconscionability "concerns the contract formation process and the alleged lack of meaningful choice; the substantive element looks to the content of the contract." *Id.* (quoting *Robinson v. Ent. One US LP*, No. 14-cv-1203 (AJN), 2015 WL 3486119, *9 (S.D.N.Y. June 2, 2015)). Even a form contract that is offered on a "take-it-or-leave-it" basis, without a chance to opt out, may be valid. *Nayal v. HIP Network Servs. IPA, Inc.*, 620 F. Supp. 2d 566, 571–72 (S.D.N.Y. 2009). "It is only when 'inequality [in bargaining power is] coupled with high pressure tactics that coerce an employee's acceptance of onerous terms [that a signatory can be considered to have] lacked a meaningful choice.'" *Zhu v. Hakkasan NYC LLC*, 291 F. Supp. 3d 378, 388 (S.D.N.Y. 2017) (quoting *Brennan v. Bally Total Fitness*, 198 F. Supp. 2d 377, 382 (S.D.N.Y. 2002)).

Plaintiffs assert the agreement is procedurally unconscionable because it was "take-it-or-leave-it" as a condition of employment. (Doc. 33 at 12.) Plaintiffs also describe a series of "sharp tactics" that AmEx used to "trick" employees into signing the arbitration agreement. (*Id.* at 13.) For example, AmEx apparently rushed Netzel and Langkamp into signing the agreement amongst a large stack of documents during their onboarding processes. (*Id.*) Plaintiffs do not include a similar argument that Smith's onboarding was procedurally unconscionable, nor do they make a procedural unconscionability argument as to Larson. (*See id.* at 12–14.) The Court thus finds no unconscionability as to Smith and Larson's agreements, and it will analyze only whether Netzel and Langkamp's

agreements were procedurally unconscionable.

AmEx paints a near opposite picture. On May 3, 2010, Netzel signed his offer letter from AmEx with the following caveat (*inter alia*): "This offer is contingent on our receiving . . . [a] signed Employment Arbitration Policy Acknowledgement Form." (Doc. 37 at 21–22.) Langkamp's application materials included similar language, including:
> I agree that, as a condition of being an applicant for employment and having my application for employment be considered by American Express, arbitration is the final, exclusive and required forum for the resolution of all employment-related disputes. . . . If I commence employment with American Express, I will continue to be subject to the terms of the Arbitration Policy.

(*Id.* at 28.) AmEx thus contends that both Netzel and Langkamp knew before beginning their employment that they would be subject to the arbitration policy. (*Id.* at 9.)

Even viewing the facts most charitably to Netzel and Langkamp, the Court finds no procedural unconscionability. Even if the arbitration agreement was layered into a stack of dozens of onboarding documents, Netzel and Langkamp had prior notice that their employment was conditional on their assent to the arbitration agreement. Both of them then undisputedly signed the agreement on their first days at AmEx. The Court cannot say that either Netzel or Langkamp were subject to a coercive high pressure tactic that effectively eliminated their ability to make a meaningful choice. *See Zhu*, 291 F. Supp. 3d at 388. Without procedural unconscionability, Plaintiffs' defense fails, and the Court need not decide whether the agreement was substantively unconscionable. *See Mumin*, 239 F. Supp. 3d at 526.

Because Plaintiffs have not established that the arbitration agreements are unenforceable, the Court finds Plaintiffs' claims are subject to arbitration under the plain language of their agreements.

**IV.    CONCLUSION**

Accordingly,

**IT IS ORDERED** granting AmEx's Motion to Compel Arbitration and Dismiss the Second Amended Complaint. (Doc. 22.)

…

1   **IT IS FURTHER ORDERED** instructing the Clerk of Court to terminate this case.

2   Dated this 3rd day of August, 2023.

_____
Honorable Susan M. Brnovich
United States District Judge